[No. 26723. *En Banc.* October 27, 1937.]

ACME FINANCE COMPANY, *Respondent,* v. HARRY C. HUSE, *as Director of Licenses, et al., Appellants,* THOMPSON SECURITIES COMPANY, *Respondent,* J. HURWITZ, *Respondent and Cross-appellant.*[1]

[1] Reported in 73 P. (2d) 341.

*The Attorney General* and *Geo. G. Hannan, Assistant,* for appellants.

*Stern & Stern,* for respondent and cross-appellant.

*Bogle, Bogle & Gates, Ray Dumett,* and *George F. Kachlein, Jr.,* for respondent Acme Finance Company.

*Mifflin & Mifflin,* for respondent Thompson Securities Company.

*Wright, Jones & Bronson, Bartlett Rummell, Carkeek, McDonald & Harris, Beverly S. Wilkerson, H. E. T. Herman,* and *Robert R. Pence, amici curiae.*

ROBINSON, J.—This action was instituted by the Acme Finance Company on May 7, 1937, under the

uniform declaratory judgment act of the state of Washington, Rem. Rev. Stat. (Sup.), §§ 784-1 to 784-16 [P. C. §§ 8108-21 to 8108-35] (Laws 1935, p. 305), inclusive, for the purpose of testing the constitutionality of chapter 213, Laws of 1937, p. 1034, the title to which is as follows:

"An Act relating to small loans; providing for the licensing and regulating the business of making loans under three hundred dollars ($300.00); prescribing a maximum rate of interest; providing for the regulation of the business of making such loans, for examination, investigations and licensing of persons engaged in such business; providing penalties for violation of the act and repealing all acts in conflict."

Plaintiff alleged, in substance, that for more than nine years it had been engaged within the state of Washington in the business of making loans, including loans in amounts of less than three hundred dollars; that chapter 213, Laws of 1937, p. 1034, would go into effect on June 9, 1937; that the defendants Harry C. Huse, director of licenses of the state of Washington, and G. W. Hamilton, attorney general thereof, would then require and compel the plaintiff, in order to continue in its said business, to take out a license, as provided in the act, and, upon its failure to comply with each and every provision in the act, would prosecute the plaintiff criminally and enforce against it other penalties therein described; that the act is void because so vague, ambiguous, and indefinite that it is impossible to determine what acts are lawful or unlawful thereunder, or to determine its meaning and scope, and will, if enforced, deprive plaintiff of its property and its officers, agents, and employees of their liberty without due process of law and deny them the equal protection of the laws.

The complaint goes on to specifically allege that the act is an unreasonable and invalid attempted exercise

of the police power, and it is contended that it violates a number of other sections of both the Federal and state constitutions.

Subsequent to the filing of the complaint, a supplemental complaint was filed, which prayed, in the alternative, that, if the act should be held constitutional, the court would then make answer to a list of questions, thereto attached, designed to clarify the act. For the purpose of illustration, we quote questions 5, 6, and 7:

"(5) Does the Director have power and authority to require the deposit of $100, mentioned in S. 2 of the Act, by an applicant for a license?

"(6) Is the Director required to pay the $100 deposit into the State Treasury, or may he retain it in his own possession?

"(7) Has the Director power and authority to expend said $100 deposit, or any portion thereof; and, if so, for what purpose?"

The remaining nine questions proposed are of a somewhat similar character.

On May 14th, Thompson Securities Company, also engaged in the business of making small loans, intervened in the action by filing a complaint very similar to the complaint of the original plaintiff, and on May 19th, J. Hurwitz also intervened, setting up that he was a licensed pawnbroker, and that, in addition to loaning money on the security of personal property, secured and pledged, he had been engaged in making other and different loans of less than three hundred dollars, and asked that the court determine what his obligations and duties are under the act, if any, and specifically what acts are lawful and what acts are unlawful thereunder.

A demurrer was interposed by defendants to the plaintiff's original and supplemental complaint, upon the grounds that the court had no jurisdiction of the subject matter of the action; that several causes of ac-

tion had been improperly united; and that the complaint did not state facts sufficient to constitute a cause of action or to entitle the plaintiff to any relief whatever. By stipulation in open court, it was agreed that this demurrer should go to the intervening complaints also.

On June 4, 1937, the court ordered the demurrers overruled, and, reciting that the defendants elected to stand upon the demurrers and refused to plead further, entered judgment in the case, in which it was ordered, adjudged, and decreed that chapter 213, Laws of 1937, p. 1034, and each and every section thereof, is unconstitutional and void. Since the lower court had determined to hold the act wholly unconstitutional, it refused to pass upon the matters raised by the intervener Hurwitz, to which objection was duly made, and he also appeals, contending that the court should have ruled on the matter, so that, in the event the law is held constitutional in this court, his status thereunder might be reviewed.

It appears from the foregoing brief statement of the case that it presents a matter important in and of itself, and of even greater importance as affecting procedure in this state; for the plaintiff has succeeded in having a law declared unconstitutional before it actually went into effect, whereas in the past such a result could only be arrived at as incidental to giving injunctive or other relief to a litigant adversely affected by the actual operation of a law. It is also noted that the plaintiff contended, as the intervener Hurwitz still contends, that, if the law were held constitutional, it would then be the duty of the court to go ahead and make a great number of constructions concerning its administration. It seems proper, and indeed necessary, that we make a general inquiry into whether or not this great departure from former practice is, in

fact, commanded by chapter 113, Laws of 1935, p. 305, known as the declaratory judgment act.

As a sanction for the maintenance of this action and for the relief demanded, the plaintiff and the interveners especially rely on Rem. Rev. Stat. (Sup.), § 784-2 [P. C. § 8108-22], which reads as follows:

"A person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder." Laws 1935, chapter 113, § 2, p. 305.

It has been frequently mistakenly asserted that the constitutional convention of 1787 four times refused to grant to the courts the right of declaring laws unconstitutional. What actually occurred, as may be seen from an examination of Madison's journal, was that the convention four times rejected a proposal to give the supreme court of the new nation the right to participate with the president in the exercise of the veto power, or, as it was then called, the "revisionary" power.

If the declaratory judgment act means all that the plaintiff and interveners say that it means, we have adopted a method of procedure somewhat akin to that. For, while the act does not provide that the courts shall share in the veto power of the executive, it *prima facie* appears to provide a procedure whereby they may declare an act of the legislature unconstitutional before it becomes effective.

In the instant case, the small loans act was to have become effective on June 9th. The governor vetoed §§ 3, 4, 6, and 12 on March 19th. His veto of those sections, as will be later seen, rendered a number of other

sections completely inoperative. The remainder of the act, that is, those sections not vetoed or rendered inoperative as a necessary consequence of the veto, was, on June 4th, declared unconstitutional by the judgment appealed from.

Hitherto, an act duly passed by the legislature was sure to go into effect if it escaped the executive veto. If the judgment appealed from be affirmed, it is reasonable to suppose that, in the future, many legislative acts will be forced to also undergo the scrutiny of the courts before they go into effect; for persons interested in preventing such acts from becoming effective will be quick to invoke the procedure used in this action, and the courts will be besought to declare many a legislative act unconstitutional the moment it has received the approval of the governor. For these and other reasons, although the matter was not briefed or argued in the case at bar, it seems advisable to proceed with caution in determining whether the relief sought in this action may properly be afforded.

The first effective American statute providing for declaratory judgments was enacted in New Jersey in 1915. By the time our own statute was enacted, some thirty-four American states and territories had adopted the procedure in some form or another. Of these, nineteen had enacted the uniform act drafted and recommended by the Conference of Commissioners on Uniform State Laws. Our statute is of that type.

The question of constitutionality was first raised in Michigan and was determined adversely by the supreme court of that state in *Anway v. Grand Rapids R. Co.*, 211 Mich. 592, 179 N. W. 350, 12 A. L. R. 26. This decision was not followed by any other court. By the time our statute was enacted, the supreme court of Michigan had reversed the *Anway* case in

*Washington-Detroit Theatre Co. v. Moore,* 249 Mich. 673, 229 N. W. 618, 68 A. L. R. 105, and eighteen other states had held laws providing for declaratory judgments constitutional. As far as we are advised, there are at this time no decisions to the contrary.

The gist of the decision of the majority in the *Anway* case is found in the following excerpt from the opinion:

"This court and the court from which this case came by appeal draw their power from the Constitution. The power given to both under the Constitution was judicial power. It is beyond the power of the legislature to take from either that judicial power and it is equally beyond the authority of the legislature to confer upon either power not judicial, or to require the performance of functions not judicial in character. This act confers power not judicial and requires performance of acts non-judicial in character. For these reasons it is void in its entirety."

During the period in which the declaratory judgment statute was being adopted by so many of our sister states, the supreme court of the United States indicated, in a number of cases, that it did not believe that an action for a declaratory judgment presented "a case" or "controversy" within the meaning of Art. III of the Federal constitution, and especially in its opinions in *Liberty Warehouse Co. v. Grannis,* 273 U. S. 70, 47 S. Ct. 282, 71 L. Ed. 541, and *Willing v. Chicago Auditorium Ass'n,* 277 U. S. 274, 48 S. Ct. 507, 72 L. Ed. 880.

To the position taken by the Michigan supreme court in the *Anway* case and to the hostile expression of the supreme court of the United States in the two cases last cited, the proponents of the declaratory judgment system made answer that it was never intended that purely advisory opinions should be rendered under that system, or that the court should render judgment

in any case unless it presented a justiciable controversy; that is to say, unless there were before the court interested parties asserting adverse claims. One of the most useful of the state decisions on this point is *Kariher's Petition (No. 1)*, 284 Pa. St. 455, 131 Atl. 265. See, also, *Washington-Detroit Theatre Co. v. Moore*, 249 Mich. 673, 229 N. W. 618, 68 A. L. R. 105, reversing the decision in the *Anway* case; and *Jewell Tobacco Warehouse Co. v. Kemper*, 206 Ky. 667, 268 S. W. 324; *Blakeslee v. Wilson*, 190 Cal. 479, 213 Pac. 495.

Where the plaintiff has no legal interest, no judgment can be rendered; *Stewart v. Stewart*, 204 Cal. 546, 269 Pac. 439; *Perry v. Elizabethton*, 160 Tenn. 102, 22 S. W. (2d) 359; and also where the defendant has no legal interest; *Revis v. Daugherty*, 215 Ky. 823, 287 S. W. 28; *Banning v. Marsh*, 124 Neb. 207, 245 N. W. 775; and no judgment may be rendered where the interest of the parties is not conflicting. *Huester v. Lackawanna County*, 308 Pa. St. 9, 161 Atl. 537; *Hicks v. Greene County*, 200 N. C. 73, 156 S. E. 164.

In 1933, the supreme court of the United States fully accepted the principle of the declaratory judgment acts and no longer regards such statutes as providing for merely advisory opinions. This came about in the case of *Nashville, C. & St. L. R. Co. v. Wallace*, 288 U. S. 249, 53 S. Ct. 345, 77 L. Ed. 730, 87 A. L. R. 1191, a case wherein the plaintiff sought a judgment under the uniform declaratory judgment act of Tennesee declaring that a state law providing for an excise tax on the storage of gasoline, in which business the plaintiff was engaged, was invalid under the commerce clause of the constitution of the United States and the fourteenth amendment. In this action, the plaintiff joined as defendants the state officer charged with the collection of the tax and the attorney general. The defendants demurred. The demurrer was sustained. They

refused to plead further, and the action was dismissed. They thereupon appealed to the supreme court of the United States. In ordering the case set down for argument, the court invited the attention of counsel to the question:—"Whether a case or controversy is presented in view of the nature of the proceedings in the state court." As a result of the argument on that question and an examination of the Tennessee declaratory judgment act, the court held that the case presented a justiciable controversy between adverse parties seeking a determination of their legal rights upon the facts alleged in the complaint and admitted by the demurrer. The court said, among other things:

"The relief sought is a definite adjudication of the disputed constitutional right of the appellant, in the circumstances alleged, to be free from the tax, . . . Obviously the appellant, whose duty to pay the tax will be determined by the decision of this case, is not attempting to secure an abstract determination by the Court of the validity of a statute, . . . or a decision advising what the law would be on an uncertain or hypothetical state of facts, . . .

"While the ordinary course of judicial procedure results in a judgment requiring an award of process or execution to carry it into effect, such relief is not an indispensable adjunct to the exercise of the judicial function. [Giving a number of examples.] . . .

"The issues raised here are the same as those which under old forms of procedure could be raised only in a suit for an injunction or one to recover the tax after its payment. But the Constitution does not require that the case or controversy should be presented by traditional forms of procedure, invoking only traditional remedies. . . . As the prayer for relief by injunction is not a necessary prerequisite to the exercise of judicial power, allegations of threatened irreparable injury which are material only if an injunction is asked, may likewise be dispensed with if, in other respects, the controversy presented is, as in this case, real and substantial."

Subsequent to this decision, Congress passed a declaratory judgment act. The first section of this act, which was approved by the president on June 14, 1934, reads as follows:

"(1) In cases of actual controversy except with respect to Federal taxes the courts of the United States shall have power upon petition, declaration, complaint, or other appropriate pleadings to declare rights and other legal relations of any interested party petitioning for such declaration whether or not further relief is or could be prayed, and such declaration shall have the force and effect of a final judgment or decree and be reviewable as such." 28 U. S. C. A. (Sup.), § 400.

An action to secure a declaration of unconstitutionality has been held maintainable under this act in *Penn v. Glenn,* (D. C. Ky.) 10 Fed. Supp. 483, and in a similar action certain provisions of the agricultural adjustment act were declared unconstitutional in *Voght & Sons v. Rothensies,* (D. C. Pa.) 11 Fed. Supp. 225. The act itself was declared constitutional by the supreme court of the United States on March 1st of this year. *Aetna Life Ins. Co. v. Haworth,* 300 U. S. 227, 57 S. Ct. 461.

It is a curious manifestation that so many of these statutes, not only confirming the right of the courts to declare legislative acts unconstitutional, but also affording a much more expeditious procedure for use in doing so, should have been enacted at a time when a considerable section of the American people, including some lawyers and law teachers, were questioning the power of the courts to declare legislative acts unconstitutional under any circumstances, even to the extent of calling the power so long exercised a usurped power. The confirmation is reassuring, although wholly unnecessary, but we accept with some doubt and hesitation a procedure where these momentous constitutional questions will, in the future, be decided

in cases where, on the one hand, the plaintiff and interveners are financially interested in striking down the legislative act and are represented by from five to a dozen firms of attorneys, and where, on the other hand, the defendant is only interested *ex officio* in sustaining it and is represented only by the attorney general and such *amici curiae* as may come to his assistance.

But whatever doubts we may have along these lines cannot be permitted to affect our decision. The legislature has spoken, and, unless we are prepared to fly in the face of unanimous authority, we are compelled to hold, first, that chapter 113, Laws of 1935, p. 305, as amended by chapter 14, Laws of 1937, p. 39, is a statute which the legislature had the power to enact; second, that, in a proper case, a plaintiff may, by the use of the method therein provided, require our courts to declare, in the form of a judgment, whether or not a statute is constitutional; and, third, that a proper case for such relief is presented when a plaintiff alleges (1) that he will be directly damaged in person or in property by enforcement of a statute; (2) that the defendant is charged with the duty of enforcing the statute; and (3) is enforcing it or is about to do so; and claims, upon these allegations, that such enforcement will result in the infringement of his (the plaintiff's) constitutional rights.

All of these conditions are present in the case at bar. There is, however, one difference between the case at bar and the case of *Nashville, C. & St. L. R. Co. v. Wallace, supra,* upon which much dependence has been placed in the foregoing discussion, which should, perhaps, be noted. In that case, the questioned law was in effect when the case was begun and the judgment rendered. In this case, the questioned law was not in effect. As heretofore stated, this action was begun on

May 7, 1937, and judgment was entered on June 4, 1937. The small loans act was not to become effective until June 9, 1937. But this difference, we think, is not material.

The trial court had before it plaintiff and interveners alleging that on June 9, 1937, the defendant would enforce the law, that it was unconstitutional and would unlawfully infringe their property rights, and a defendant who admitted that he would begin enforcing the law on June 9th. The plaintiff and interveners were in this dilemma: If, on the one hand, they complied with the act on June 9th, and the act was, in fact, unconstitutional, they would do so to their damage. If, on the other hand, they refused to comply with the law, and they were wrong in thinking it unconstitutional, they would suffer the criminal penalties provided in the act. Either course was fraught with danger. To afford relief to parties in such a situation is the very purpose of the declaratory judgment act.

The material consideration is that the case, as made, answered all the requirements of a justiciable controversy. The plaintiff and interveners alleged that the defendant would enforce the law on and after June 9th, claimed that it was unconstitutional, and that they would therefore suffer legal damage. The defendant admitted that he would enforce the law as being constitutional on and after June 9th. Here was an interested plaintiff and an interested defendant, and they were in sharp controversy. The trial court was, therefore, compelled to take jurisdiction and render judgment, and, on appeal, we must decide whether or not it rightly declared that chapter 213, Laws of 1937, p. 1034, "and each and every section and provision thereof is unconstitutional, null and void."

The parties in the case and *amici curiae* have

filed voluminous briefs in which the question of constitutionality has taken a very wide range. We think that the discussion can be greatly reduced and simplified by an analysis of the act, with the particular purpose of ascertaining just what remained after the governor exercised his veto power; for, of course, it is only with that remainder that we are concerned. The act, omitting its formal parts, is as follows:

"Section 1. No person, copartnership, association or corporation shall engage in the making of loans of money, credit goods or choses in action in an amount not to exceed three hundred dollars ($300.00) except as in this act provided.

"Sec. 2. All persons now engaged in the making of such loans either as a business or a side line shall register with and receive a certificate of registration from the tax commission as is provided under chapter 180, Laws of 1935, and keep such certificate renewed and in good standing at all times. It shall be the duty of the tax commission to transmit to the director of licenses a true and complete list of all such registrations on file in the office of the tax commission. In addition to the registration all persons desiring to engage in the business of making small loans as a business or as a side line must apply to the director of licenses for permit so to do. Such application must be in writing, contain the official registration number with the tax commission; must also contain name, residence, location and whether or not such applicant desires to carry on a full time or a side line business. Such application must be accompanied by a petition of at least ten freeholders recommending such applicant and certifying to a personal acquaintance for a period of at least three years immediately prior thereto. Such applicant must deposit with the director of licenses the sum of one hundred dollars ($100.00) to cover investigation costs. It shall be the duty of the director to investigate each application.

"Sec. 3. No license or permit shall be issued to any applicant until the director has had reasonable opportunity to make a thorough investigation: *Provided,*

*however,* That an applicant already engaged in the business shall be entitled to receive a temporary permit pending such investigation: *Providing,* That all applicants must post and keep in force during life of permit or license, a penal bond in the sum of ten thousand dollars ($10,000.00) payable to the State of Washington conditioned that such applicant will conform to all requirements of law and refund any overcharge found by director. No license shall ever be granted to a corporation other than as hereinafter provided, nor to any person who is not a citizen of the United States or who has not resided in the State of Washington at least five (5) years or three (3) years in the city where the right to do business is sought. All expenses of investigation shall be borne by the applicant, and the action of the director of licenses to be final and conclusive, except for fraud or caprice. In event that the license is granted it shall be for a period of time coincident with the registration with the tax commission, to be renewed annually, and the annual license fee is hereby fixed at twenty-five dollars ($25.00), and in addition thereto such licensee shall furnish to the director a copy of annual business tax report to the tax commission, under chapter 180, Laws of 1935, and pay as a regulatory and examination fee a sum equal to three per cent (3%) of the gross business. [*Vetoed.*]

"Sec. 4. No business shall be conducted in a room in connection with any other business, nor shall the operation of such business be co-mingled with any other business operated by such applicant. Each separate place of business of applicant must be licensed. [*Vetoed.*]

"Sec. 5. No person licensed hereunder shall receive any sum of money, credit or other consideration for the use of the money loaned, or for the making of such loan, or for any other purpose in connection with such loan than twelve per cent (12%) simple interest, and no person shall collect or receive any discount, service charge, carrying charge, examination fee or other charge with relation to such loan, and any person evading the purpose and intent of this law with respect to receiving a greater rate for the use of money, property or credit than twelve per cent (12%) per annum

simple interest, upon conviction shall be subject to the penalties provided for a gross misdemeanor, and in addition thereto the loan, pledge or transfer of credit, property or chose in action is void, and title thereto shall pass and vest in the borrower and all right of recovery therefor barred.

"Sec. 6. That no persons licensed hereunder shall demand or receive on any loan, the endorsement of a surety, guarantor or comaker, but all such loans shall be to the individual borrower and upon security which he may legally hypothecate: *And provided further,* That no person licensed hereunder may loan in excess of twenty-five per cent (25%) of all outstanding obligations in the same class of securities or in the same class of loans. [*Vetoed.*]

"Sec. 7. All licensees hereunder must give the borrower a receipt for all payments, which shall not only show the amount of the payment but total payments to date and the balance due.

"Sec. 8. All licensees must keep license to do business posted in a conspicuous place in place of business. Such permit shall not be assignable: *Provided, however,* That the same may be transferred from one address to another in same city when such change is caused by removal of such business from one location to another.

"Sec. 9. The director of licenses shall have the right for cause, after hearing, to suspend or revoke the license of any licensee, with the right of review of the act of the director by such licensee in the superior court of the county where place of business affected is located. The director is hereby empowered to prescribe methods of procedure governing hearing, and service of any order by mail shall be legal and sufficient service.

"Sec. 10. The director of licenses shall at least annually, and oftener if by him deemed advisable, examine the affairs of all licensees, and may require such information or reports as may be of aid in determining the true conditions of affairs of such licensees.

"Sec. 11. It shall be unlawful for any licensee either directly or indirectly by subterfuge or by agreement with any third person or other person to receive any

greater rate than twelve per cent (12%) simple interest. It shall be unlawful to make the loan for an amount in excess of three hundred dollars ($300.00) and to give credit thereon, or to sell or transfer articles at a fictitious value for the purpose of evading the requirements of this act, and any person convicted of violating any provision of this section shall be guilty of a gross misdemeanor.

"Sec. 12. It shall be unlawful to advertise in any manner the business of making small loans. [*Vetoed.*]

"Sec. 13. The payment of three hundred dollars ($300.00) or less in money, credit, goods, or other things in action, as consideration for any sale or assignment or order for the payment of wages, salary, commissions or other compensation for services, whether earned or to be earned, shall, for the purpose of regulation under this act, be deemed a loan secured by such assignment, and the amount of such assigned compensation retained by the lender in excess of the amount loaned shall be deemed interest or charges from the date of such loan to the time such compensation is paid. Such transaction shall be governed by and be subject to the provisions of this act.

"Sec. 14. This act shall not apply to banks, trust companies, building and loan association, credit unions, industrial loan companies, licensed pawn brokers, individuals making casual loans of their own money, or retail merchants selling on installment under conditional sales contract.

"Sec. 15. The director is authorized to make general rules and regulations not inconsistent herewith.

"Sec. 16. This act is a limitation on existing laws and to be construed as the law governing the making of small loans, and any provision of existing laws to the contrary is hereby superseded by the provisions herein.

"Sec. 17. If any action or provision of this act is declared unconstitutional such decision shall not invalidate the remaining portion of the act."

Since § 3 was vetoed, it follows that no licenses can be issued as required under the act, for all the particulars and specifications of the proposed licenses are

wiped out by the veto. The veto, therefore, also took with it § 2, for it would be a vain, useless, and unlawful thing to require an application for a license, accompanied with a fee of one hundred dollars, when no license can be issued. Since no license can be issued, §§ 7, 8, 9, 10, and 11 must, obviously, be inoperative, for they relate only to licensees and licenses. A portion of § 5, and possibly all of the section, must go out for the same reason. We will, however, assume, for the purpose of argument, that the latter part may remain, although the words "no person" and "any person" in that portion may well be construed to refer only to licensees and their employees. The latter part of § 5, p. 1036, reads as follows:

". . . and no person shall collect or receive any discount, service charge, carrying charge, examination fee or other charge with relation to such loan, and any person evading the purpose and intent of this law with respect to receiving a greater rate for the use of money, property or credit than twelve per cent (12%) per annum simple interest, upon conviction shall be subject to the penalties provided for a gross misdemeanor, and in addition thereto the loan, pledge or transfer of credit, property or chose in action is void, and title thereto shall pass and vest in the borrower and all right of recovery therefor barred."

So much of the law having been rendered inoperative by the veto of § 3, it is impossible to see how the director of licenses would have the power to regulate anything under the provisions of § 15. We have remaining, therefore, only §§ 1, 13, 14, 16, and 17, and a portion of § 5. Consolidating these sections and reducing the matter to its lowest terms, we have remaining a law which says, in effect: Any persons, firm, or corporation, *except* a bank, trust company, building and loan association, credit union, industrial loan company, licensed pawnbroker, one making casual

loans of his own money, or a retail merchant selling under conditional sales contracts, who, by any method, including the receipt of discounts, or by making service or carrying charges or examination fees, charges a greater rate of interest than twelve per cent per annum simple interest on loans of three hundred dollars or less, shall be guilty of a gross misdemeanor, and, in addition thereto, the title to the loan, pledge, transfer of credit, or chose in action shall pass to and vest in the borrower and all right of recovery be barred. As indicated by the title of the act and its vetoed provisions, the legislature set out to pass a law licensing certain makers of small loans and providing a broad and intensive system of regulation. We have left after the veto nothing more than a statute making it a crime for certain persons to charge more than twelve per cent interest on loans under three hundred dollars and which forfeits the loan if the statute be disobeyed.

It seems to us that a mere statement of the matter is all that is required to show that the act, or, more accurately speaking, what remains of it, is unlawfully discriminatory. The excepted classes are so numerous and varied and cover such a broad field that the act, in fact, does not have the semblance of a general law, but of a special one aimed at a special and limited class. It clearly denies to that class the equal protection of the laws, within the meaning of the fourteenth amendment to the Federal constitution, because, among other things, it permits the classes excepted by § 14, p. 1038, the right to collect service and carrying charges, etc., over and above the lawful twelve per cent interest rate, and provides a criminal penalty for all others who do so. By the same token, it grants to the excepted classes special privileges and immunities in violation of Art. I, § 12 of the state constitution.

There is no warrant for so arbitrary a classification,

especially in a criminal statute. The injury done by a usurious loan is the same when the loan is made by a bank or trust company or a licensed pawnbroker as when made by anyone else. *Wallace v. Zinman,* 200 Cal. 585, 254 Pac. 946, 62 A. L. R. 1341; *Truax v. Corrigan,* 257 U. S. 312, 42 S. Ct. 124, 66 L. Ed. 254, 27 A. L. R. 375; *State v. Robinson Co.,* 84 Wash. 246, 146 Pac. 628; *Spokane & Eastern Trust Co. v. Hart,* 127 Wash. 541, 221 Pac. 615; *Aberdeen Sav. & Loan Ass'n v. Chase,* 157 Wash. 351, 289 Pac. 536, 290 Pac. 697, 71 A. L. R. 232; *State ex rel. Bacich v. Huse,* 187 Wash. 75, 59 P. (2d) 1101.

Having come to the conclusion above stated, the questions raised by the plaintiff's alternative prayer and the question raised by the cross-appellant need not be answered.

The judgment of the lower court is affirmed.

STEINERT, C. J., MAIN, BEALS, and MILLARD, JJ., concur.

GERAGHTY, J. (concurring)—While I agreed with the views of the majority on the main issues in this case, I had some doubt of the propriety of the court's entertaining an action to pass upon the constitutionality of an act of the legislature in advance of its effective date, even though, as pointed out in the majority opinion, the declaratory judgment act would seem to warrant the proceeding. I find, however, that the practice of entertaining agreed cases involving the constitutionality of statutes has become firmly established. Long before the practice received express statutory approval by the declaratory judgment act, Judge Chadwick, in *Huntworth v. Tanner,* 87 Wash. 670, 152 Pac. 523, Ann. Cas. 1917D, 676, speaking for the court, said:

"To bring a case to this court to test the constitutionality of laws has become a constant practice. They

are brought here by the officers of the state, by individual litigants, and by the connivance—and we use the word in no derogatory sense—of the state and the individual. We have accomplished by an accepted practice what has been done by the legislature or by constitutional amendment in some of the other states, notably in the state of Massachuetts, where laws are submitted for the opinion of the judges prior to the time of their final passage by the legislature. In most of the cases of the kind to which we have referred, we know, as everyone knows, no real controversy has arisen, and that the object of the suit is to take the opinion of this court. In recent years we have passed upon the constitutionality of laws in what may be truthfully declared to be agreed cases, scores of times, the most prominent instance being in the case of *State ex rel. Davis-Smith Co. v. Clausen,* 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466, where, with nothing before us but the question of whether the law, not yet in operation was constitutional, we anticipated it and went into every phase of the law of the case."

On the strength of the practice thus recognized, I feel warranted in concurring in the majority opinion.

BLAKE, J. (dissenting)—Since the supreme court of the United States and courts of last resort in eighteen states have held declaratory judgment statutes valid, it must be admitted that the constitutionality of our own act is not debatable. It does not follow, however, that the act can be construed as conferring upon the courts the power of judicial veto. To put such construction upon it would render the act unconstitutional under the well recognized and often applied doctrine of unlawful delegation of legislative power. For, if the legislature cannot delegate its legislative power to the executive, surely it cannot abdicate such power to the judiciary.

The purpose of the declaratory judgment act is to *construe* contracts and statutes—not to abrogate, annul,

supplement, or detract from them. In this case, the majority have abrogated and annulled a statute which would be invulnerable to judicial construction, but for the theory that the declaratory judgment act has endowed the court with the power of judicial veto. I cannot accede to that view.

Under all the rules of statutory construction hitherto recognized and applied, chapter 213, Laws of 1937, p. 1034, withstands the challenge to its constitutionality. For the act is plain in purpose and salutary in effect—or would be but for the exercise of judicial veto. That the business of loaning money for interest is a privilege and not a right has been long recognized in commercial states (27 R. C. L. 203, 204)—witness: the abolition of private banking, the regulation of national banks by Congress, and state banks and savings and loan associations by the state.

The purpose of chapter 213, Laws of 1937, p. 1034, is to regulate the business of the loan shark, whose rapacity has hitherto been unchecked in this state. Leaving out the vetoed (executive) sections, the act (§ 2, p. 1034) provides that all who engage in the business of making loans under three hundred dollars shall register with the tax commission and apply to the director of licenses for a permit. It also requires that the application contain the name, residence, and location of the applicant, and be accompanied by the petition of ten freeholders. It also requires that the applicant shall deposit with the director of licenses the sum of one hundred dollars "to cover investigation." Plainly, these provisions constitute a legitimate exercise of the police power, and, standing alone, are sufficient to withstand the challenge to the constitutionality of the whole act. For the act contains a saving clause:

"If any action or provision of this act is declared unconstitutional such decision shall not invalidate the remaining portion of the act." Laws 1937, chapter 213, § 17, p. 1039.

But it is not necessary to rest here, for the act as a whole is soundly grounded in constitutional authority.

Section 5, p. 1036, is designed to prevent the licensee from charging more than twelve per cent interest through the well known devices of "carrying charges" and "examination fees."

Section 7, p. 1037, provides that the licensee

". . . *must give the borrower a receipt for all payments, which shall not only show the amount of the payment but total payments to date and the balance due.*" (Italics mine.)

Obviously, the purpose of this provision is to discourage a well known method of bilking the borrower indulged in by the less scrupulous members of the fraternity. Standing alone, the provision is a wholesome and reasonable exercise by the state of its police power.

Section 8, p. 1037, requires the licensee to keep his license posted in a conspicuous place in his office. This is so common a regulation with respect to businesses subject to the police power that it requires no comment.

Section 9, p. 1037, empowers the director of licenses to revoke licenses *"for cause, after hearing."* The director is empowered to prescribe methods of procedure governing such hearings. Provision is made for service of orders by mail and appeal by the licensee to the superior court. Surely, in view of the provisions of statutes (heretofore held constitutional) relating to hearings before the department of labor and industries, the department of public works, and the liquor con-

trol board, this section cannot be the subject of assault.

Section 10, p. 1037, requires the director of licenses to examine the affairs of licensees. It empowers him to require such information and reports as may be "of aid in determining the true conditions of affairs of such licensees." Again we need only advert to the powers of the director of labor and industries, the director of public works, and the liquor control board. More aptly, perhaps, might be cited the regulations requiring the examination of and reports from banks and savings and loan institutions.

Section 11, p. 1038, is designed to prevent another well known practice indulged in by votaries of the business: that of securing a greater amount of interest by making the loan through a dummy, who is ostensibly the offender in exacting usurious interest.

Section 13, p. 1038, is designed to obviate another trick of the trade: that of taking title to the borrower's personal property and then selling it back to him on conditional bill of sale—thus disguising the loan character of the transaction.

Section 14, p. 1038, exempts from the operation of the act (1) banks, (2) trust companies, (3) building and loan associations, (4) credit unions, (5) industrial loan companies, (6) licensed pawn brokers, (7) individuals making casual loans, and (8) retail merchants selling on installment and conditional sales contract. In considering this section, it must be kept in mind that, in the exercise of the police power, the legislature is vested with the broadest discretion in classifying businesses and individuals. The court will not indulge in nice distinctions in judging whether the classifications are reasonable. If any reasonable hypothesis can be discerned for the legislative inclusions or exclusions, the act will not be held invalid on the ground of discrimination, even though the court may disagree

with the policy. *Quong Wing v. Kirkendall,* 223 U. S. 59, 32 S. Ct. 192.

But, aside from the rule, I think that the reasons for exempting from the operation of the act the classes named are too obvious to warrant judicial examination, much less criticism. The first six classes are already subject to regulation under other statutes. The seventh and eighth are not in the *loan business.* When one may cease to be a "casual" loaner of money and enter upon the *loan business* is a matter to be determined in specific instances. If one considers himself a "casual," he need not comply with the act—thereby running the risk of the director of licenses and the courts disagreeing with him. Certainly, the distinction made between the "casual" and the "professional" —if he may be called such—does not warrant the court in holding the whole act unconstitutional at the behest of the latter.

Finally, the act cannot be held discriminatory on the ground that its operation is limited to loans of less than three hundred dollars. Obviously, in fixing that limitation, the legislature had in mind the protection of that unfortunate class of borrowers who can offer as security only property exempt from execution except when pledged to secure specific obligations.

Believing the act to be not only a reasonable but a salutary exercise of the police power of the state, I dissent.

HOLCOMB, J., concurs with BLAKE, J.