[No. 57586-0. En Banc. November 1, 1990.]

ANDREA K. VANGOR, ET AL, *Appellants,* v. RALPH MUNRO, *as Secretary of State, Respondent.*

*John Wesley Johnson,* for appellants.

*Kenneth O. Eikenberry, Attorney General, James Martin Johnson, Senior Assistant,* and *David M. Driesen, Assistant,* for respondent.

PER CURIAM.—The sponsor of an initiative seeks review of a superior court order denying a writ of mandamus to compel certification of the initiative as having a sufficient number of signatures to appear on the ballot. We affirm the order of the Superior Court denying the writ.

Andrea Vangor is the sponsor of Initiative 534, which would limit the display and dissemination of matters "harmful to minors." On July 6, 1990, Vangor submitted to the Secretary of State petitions for the initiative bearing

180,373 names. The Secretary of State later informed Vangor that the initiative could not be certified for inclusion in the November ballot, because the petitions lacked the necessary 150,001 valid signatures. Vangor then filed this mandamus and declaratory relief action in Thurston County Superior Court, challenging the rejection of voter signatures on the basis that the Secretary had not maintained adequate voter registration records.[1] Following a superior court order adverse to her position, this request for review was filed.

V. Jean Womer, the Secretary's elections assistant and initiative and referendum coordinator, detailed the practices and actions of that office in two affidavits. These indicated that when the Initiative 534 petitions were received on July 6, they were first microfilmed and then sorted and placed in volumes as required by law. Womer's staff trained the verification checkers, and began verification on July 25. They initially examined the signatures to see if they matched the Secretary's file of registered voter signature cards. If a match was found the signature was accepted as valid. Any signature found more than once in the petitions was accepted only once. These duplicates were the only signatures invalidated during this phase of the process.

When a checker was unable to verify a signature, a second and more extensive search was made by a supervisory checker. If a card was still not found, the signature would then be compared to new voter registration cards received from county auditors after the process began. At this point in checking on Initiative 534, the Secretary's staff had accepted 145,412 signatures as valid.

On August 17, Womer and her staff began the final phase of the verification process. They compared previously unaccepted signatures to an alphabetical computer list of county registration records which had been transmitted by the counties to the Secretary that week. These printouts

---

[1]Vangor's petition was joined by other initiative proponents; for convenience they will be referred to here jointly as Vangor or appellant.

include current addresses, which are helpful in locating the record of a voter who signed with a different form of his or her name or where the signature or other information is incomplete or illegible.

Womer states her staff received "computer printouts from most of the counties." For some "very small counties, we requested copies of individual records instead of complete printouts." In this final phase of the process, Womer's staff accepted an additional 1,396 signatures, making a total of 146,808.

In her second affidavit, Womer states that subsequent to a 1972 statutory change, county auditors have the sole responsibility for custody of voter registration records at the local level and for transmittal of voter registration cards and other information to the Secretary. Signature cards are maintained by the Secretary alphabetically by county. New cards are added when received, and old cards are removed when registrations are canceled by the county auditors. New cards and cancellations are usually received weekly or monthly, depending upon the size of the county and the volume of transactions. Prior to checking the signatures on an initiative, the office contacts all county auditors to remind them to promptly send new records received before the initiative was submitted.

Womer's office also undertakes periodic comparisons of the Secretary's card file with county lists, updating both the Secretary's records and county files when necessary. Attached to her affidavit is a county–by–county summary of this maintenance program, which suggests that for the entire state the discrepancy between county records and cards on file in the Secretary's office has been 0.5605 percent.

Also before the Superior Court were affidavits of Vangor and initiative proponent Larry L. Lutz. Vangor's affidavit is essentially a narrative of the verification process and her participation in it. She states that, during what Womer characterized as the final phase of the verification process,

the Secretary's staff ordered computer printout lists of registered voters from nine counties. Because of her own analysis of the results from four counties, she began to suspect that new voter registration cards were missing from the Secretary's files. She asked Womer and staff if they knew whether new files were being properly forwarded, and was told that counties were "supposed to" send cards.

Vangor also notes that the check of new cards received from Spokane County during the validation process changed the rejection rate for that county from 18.5 percent to 16.5 percent. She further observes that as late as August 17, "well after the master check was completed for Snohomish County, a large number of cards" was received from that county. Vangor did not believe the late receipt of that information affected the outcome, however, inasmuch as her group had registered few voters in that county.

Just before the initiative was submitted, Womer's staff checked King County's records, and proceeded through names beginning with the letters A through G. When using the August printout, however, the staff found about 20 cards were missing from this group of letters.

Lutz projected in his affidavit that if all invalid signatures were checked against computer printouts, the result would be "1,799 accepted signatures" and "502 petition signers whose cards are missing but presumed acceptable."

Finally, Lutz "projects" that "missing data for newly registered voters who signed I–534 has disqualified an indeterminate number, probably between 2,500 and 3,500, based upon discrepancies known to exist between local records and the Secretary's records." Lutz appears to base this estimate on the discrepancies noted by Vangor between local records on new filings and those of the Secretary. He does not explain how he came up with 2,500 to 3,500 "likely signers" of the initiative from the 7,000 or so discrepancies noted by Vangor.

In its order denying the writ of mandamus, the Superior Court found that neither Vangor nor Lutz qualifies as an expert to give an opinion on election matters. Assuming

their qualification, the court also found that "many of the assumptions" upon which they base their analysis are not well founded. Portions of Vangor's affidavit, in addition, were also struck as hearsay. The trial court concluded that certifying an initiative is a discretionary act, and that mandamus is not available to compel the performance of a discretionary act unless the actions of the public officer are shown to be so arbitrary and capricious as to amount to a failure to exercise discretion. The court concluded that, in maintaining voter records, the Secretary has properly discharged his duties "pursuant to statute and Constitution." The court noted that the Secretary does not have statutory authority to control the performance or timing of all acts of auditors, who perform a necessary part of the process of maintaining voter records.

The court recognized that, under this court's decision in *Sudduth v. Chapman,* 88 Wn.2d 247, 558 P.2d 806, 559 P.2d 1351 (1977), the right of initiative is fundamental and a presumption of validity attaches to petition signatures. The court concluded, however, that the Secretary now maintains his records in accordance with *Sudduth.* While the court concluded that signatures valid at the time made should be counted, even though the voters' registrations were later canceled, the court stated it could not find "from this record this is a significant figure."

Finally, the court concluded that, were the Secretary to accept Vangor and Lutz' statistical analysis, he still would have been bound by the 110 percent requirement of RCW 29.79.200 not to certify the initiative.

Nine assignments of error are listed by appellant which relate to three general issues:

1. Whether the trial court erred in applying the ordinary standard of review in mandamus actions for review of discretionary acts.

2. Whether the Secretary failed to carry out his duties to maintain proper and correct voter registration records and to evaluate petition signatures by reference to such records.

3. Whether the Secretary acted arbitrarily and capriciously in the procedures he employed in testing the validity of voter signatures or in concluding that Initiative 534 should not be certified.

The key to resolving each of these issues is found in *Sudduth v. Chapman, supra.* There, the proponent of an "anti–fluoridation" initiative sought a writ of mandate to compel the Secretary to certify the measure. The Secretary rejected the signatures of 4,656 registered voters because they had signed more than once. The proponent for the initiative showed that a number of these rejected signatures were in fact those of registered voters and that the Secretary had failed to go beyond his card files. In checking 21 rejected signatures against King County files, the initiative proponent found that 16 were from registered voters. Using these figures as a projection, an expert concluded that more than a sufficient number of registered voters had signed petitions.

We reversed, in a 5–to–4 decision, the Superior Court's denial of the writ. Our first conclusion was that RCW 29.79.200 was unconstitutional in its provision that in instances of duplicate signatures both would be rejected (rather than counting one of the signatures as valid).

When the signatures which should not have been invalidated on this basis were added to the total, the petitions were still 264 signatures short. The initiative proponent's evidence, however, also tended to show that, because the Secretary's records were not kept current, "a large number of registered voters were erroneously rejected—and most probably a sufficient number to validate the petition." *Sudduth,* at 253. We found a statutory duty resting on the Secretary to keep his records current. We concluded:

> It must be remembered that the constitutional provision is self–executing. In a case such as this, where the proponent of a measure was able to discover a substantial number of errors due to inadequacy of records within a very short period of time, and where the evidence shows that the Secretary of State was aware of the state of his records and does not claim to have taken any steps to see that the situation was corrected, and

where out of 13,043 rejected signatures only 264 are needed to qualify the measure, we think that the presumption of validity which attaches to a signature upon a petition must weigh sufficiently in the proponent's favor to entitle her to have the measure placed upon the ballot.

(Footnote omitted.) *Sudduth,* at 255. We accorded a presumption of validity to the signatures only after listing a failure in several regards of the Secretary to keep adequate records which affected a significant number of signatures.

■■ Mandamus will not lie to compel the performance of acts or duties which call for the exercise of discretion. *State ex rel. Tubbs v. Spokane,* 53 Wn.2d 35, 38, 330 P.2d 718 (1958). In addition, the acts of registration officers in comparing and certifying genuine and spurious signatures on petitions are acts of "authorized discretion." *State ex rel. Harris v. Hinkle,* 130 Wash. 419, 429, 227 P. 861 (1924).

■ The trial court concluded that the Secretary's acts in verifying signatures are discretionary, and that, for mandamus to lie, a clear abuse of discretion must be found amounting to a failure to exercise discretion. The trial court harmonized *Sudduth* by indicating that the Secretary in that case had simply ignored his duty under the statute to maintain reasonable records. The facts there support that interpretation inasmuch as it was virtually assured that more than 264 signatures, enough to validate the initiative, had not been counted. The trial court here significantly concluded that the Secretary now maintains its records in accordance with *Sudduth.* Having found that *Sudduth* does not compel a result different from that reached by the trial court in this case, appellant's other arguments do not compel us to reach a result which would overturn the action of the trial court. While appellant suggests other procedures the Secretary might use, she makes no argument that would reveal enough new voter registrations to assure certification of her initiative. Error has not been assigned to the trial court's decision to strike portions of appellant's affidavit as hearsay, or to the trial court's refusal to accept her projections as expert opinion based on valid assumption, or to its

conclusion that in any event her statistical evidence falls short of the 110 percent requirement of RCW 29.79.200.

Appellant finally contends that, if the Superior Court was correct in applying the abuse of discretion standard, it should have found several of the Secretary's acts to be arbitrary and capricious. No persuasive argument is made regarding these claims and we find them to be without merit.

The trial court correctly declined to order the Secretary of State to certify Initiative 534 for inclusion on the ballot. The order of the trial court is affirmed.