[No. 61213-7. En Banc. August 29, 1994.]

GEORGE WALKER, ET AL, *Petitioners*, v. RALPH MUNRO, ET AL, *Respondents*.

*Preston Gates & Ellis*, by *Paul J. Lawrence* and *John David Fugate*, for petitioners.

. *Christine O. Gregoire*, Attorney General, *Narda Pierce*, Solicitor General, and *Jeffrey T. Even* and *Anne E. Egeler*, for respondents.

*James M. Johnson*, for intervenors.

*Hugh D. Spitzer* on behalf of American Association of University Professors, amicus curiae for petitioners.

*Ronald A. Zumbrun, Robin L. Rivett, Deborah J. La Fetra*, and *John M. Groen* on behalf of Pacific Legal Foundation, amicus curiae for respondents.

BRACHTENBACH, J. — Petitioners bring an original action, requesting a writ of mandamus, a declaratory judgment, and an injunction, based on the claimed unconstitutionality of certain provisions of Initiative 601 under the state constitution. The Respondents and Intervenors move to dismiss the action. We grant the motion to dismiss.

On November 2, 1993, Initiative 601 was approved by the voters by a vote of 774,342 in favor and 737,735 opposed. Generally, Initiative 601 is a measure limiting expenditures, taxation, and fees. Section 8, limiting the amount fees may be increased, and section 13, providing for voter approval for certain tax measures, went into effect immediately. The rest of the provisions will not take effect until July 1, 1995.

Beginning July 1, 1995, the state tax revenue limit will be replaced by a state expenditure limit. Under section 2 of the initiative, the limit for a fiscal year is to be calculated by increasing the previous year's limit by a percentage equal to the fiscal growth factor, which is derived by averaging the sum of inflation and population change for a 3-year period. The State Treasurer is prohibited from issuing or redeeming a check, warrant, or voucher that will result in a general fund expenditure beyond the limit for the fiscal year.

Under section 3 an emergency reserve fund is established, in which state revenues in excess of the expenditure limit are deposited. Moneys from the fund may be appropriated, within limits, only by approval of two-thirds of the members of each house of the Legislature. If the emergency reserve fund balance exceeds a certain amount, the balance. is transferred to an education construction fund. The Legislature may only appropriate moneys from that fund for school construction, unless the appropriation is approved by a two-thirds vote in each house and is approved by a vote of the people at the next general election.

Under section 4, any action that raises state revenue or requires a revenue-neutral tax shift may be taken if approved by a two-thirds vote of each house and if the state expenditures will not exceed the expenditure limits. If the action results in expenditures in excess of the limit, then the

action requires a two-thirds majority in each house and voter approval at the next general election. Where an emergency has been declared, the state expenditure limit may be exceeded if approved by two-thirds of each house and signed by the Governor.

Under section 8, effective immediately, a fee may not increase in a fiscal year by a percentage in excess of the growth factor, unless there is prior legislative approval. Section 13, which continues in effect only until July 1, 1995, when the other provisions become effective, provides that voter approval is required to raise existing taxes, impose new taxes, or make revenue-neutral tax shifts.

In December 1993, the Petitioners requested that the Attorney General file suit on their behalf and on behalf of the taxpayers of Washington, to challenge the constitutionality of Initiative 601. The Petitioners include: three public advocacy groups (one relating to children and two relating to senior citizens), two legislators, and six Washington citizens. The Attorney General refused to file suit. The Petitioners then filed a petition in this court. The Respondents, five state officials, answered the petition and moved to transfer the cause to Thurston County Superior Court. We denied the motion. Linda Smith and the Washington Taxpayer Protection Coalition, sponsors of the initiative, moved to intervene and the motion was granted. The Intervenors then moved to dismiss, which was followed by the Respondents' motion to dismiss. We first set the hearing on the motion to dismiss in conjunction with oral argument on the substantive issues, but later ordered that the motion to dismiss be heard separately. We now grant the motion to dismiss.

The Petitioners seek a writ prohibiting the Respondent state officials from implementing and enforcing Initiative 601, a declaratory judgment that Initiative 601 is unconstitutional, and a permanent injunction barring its operation. Petition for Writ of Mandamus and for Declaratory Judgment and Injunctive Relief (hereinafter Petition), at 2. The Petitioners assert that jurisdiction of this court is founded upon Const. art. 4, § 4; RAP 16.2(a); RCW 7.16.150

*et seq.* (governing mandamus proceedings); and RCW 7.24.010 *et seq.* (the Uniform Declaratory Judgments Act). Under the Washington State Constitution, the Supreme Court has original jurisdiction in "habeas corpus, and quo warranto and mandamus as to all state officers". Const. art. 4, § 4. Petitioners assert they are seeking declaratory and injunctive relief as incidental to the writ of mandamus. Br. of Pet'rs, at 43.

With the exception of sections 8 and 13, none of the provisions of the initiative are effective until July 1, 1995. Unless otherwise noted, the following discussion relates to the Petitioners' claims regarding those sections of the initiative not yet effective, which are the primary focus of this action. We will address sections 8 and 13 separately.

■ ■ We note at the outset that mandamus is an extraordinary writ. Our original jurisdiction to issue a writ is both nonexclusive and discretionary. *Department of Ecology v. State Fin. Comm.*, 116 Wn.2d 246, 804 P.2d 1241 (1991). When directing a writ to the Legislature or its officers, a coordinate, equal branch of government, the judiciary should be especially careful not to infringe on the historical and constitutional rights of that branch.

■ In their Petition, the Petitioners request the court to issue a writ of mandamus directing the Respondents "to adhere to the requirements of the Washington State Constitution and to prohibit them from implementing and enforcing Initiative 601". Petition, at 18. Writs are not directed at a general course of conduct. In *State ex rel. Taylor v. Lawler*, 2 Wn.2d 488, 490, 98 P.2d 658 (1940), we said:

> The jurisdiction given to this court by the state constitution in Art. IV, § 4, to issue writs of mandamus to state officers, does not authorize it to assume general control or direction of official acts.

Instead, the remedy of mandamus contemplates the necessity of indicating the precise thing to be done. *Clark Cy. Sheriff v. Department of Social & Health Servs.*, 95 Wn.2d 445, 450, 626 P.2d 6 (1981) (citing *State ex rel. Hawes v. Brewer*, 39 Wash. 65, 80 P. 1001 (1905)). In *State ex rel.*

*Pacific Am. Fisheries v. Darwin*, 81 Wash. 1, 12, 142 P. 441 (1914) (citing *State ex rel. Hawes v. Brewer*, 39 Wash. 65, 67-69, 80 P. 1001 (1905)), we also stated:

Mandamus will not lie to compel a general course of official conduct, as it is impossible for a court to oversee the performance of such duties. . . .

. . . It is therefore necessary to point out the very thing to be done; and a command to act according to circumstances would be futile.

It is hard to conceive of a more general mandate than to order a state officer to adhere to the constitution. We have consistently held that we will not issue such a writ.

This does not mean that a writ cannot issue in regards to a continuing violation of a duty. Where there is a specific, existing duty which a state officer has violated and continues to violate, mandamus is an appropriate remedy to compel performance. *See Clark Cy. Sheriff v. Department of Social & Health Servs., supra* (cited by the Petitioners). In *Clark Cy. Sheriff*, the Department of Social and Health Services was required by statute to accept all convicted felons offered by the sheriff for transfer to a reception center. The Director of the adult corrections division maintained that he had discretionary power to delay acceptance. The Department of Social and Health Services repeatedly accepted less than half the persons offered for transfer, and took the position that it could continue to do so. This court upheld the superior court order granting a writ of mandamus to compel the Department of Social and Health Services to accept the felons. Although this writ was directed at future conduct, *i.e.*, accepting the felons in the future, the Director had also failed to act on many previous occasions. Further, the order compelling the Director to perform his duty was quite specific. The court ordered the Director to receive at the reception center inmates of the Clark County Jail convicted of a felony and committed to a state penal institution by the Superior Court for Clark County. *Clark Cy. Sheriff*, at 450. Although the Petitioners would have us rely on this case for authority to issue a writ directed at

general conduct here, there is a difference between a recurring situation where the same specific duty repeatedly arises, and a general course of official conduct. A writ directing four public officials to comply with the constitution would prescribe not merely future actions, as Petitioners argue, but an entire scope of official duties. We decline to issue a writ directing officers of the State to adhere to the constitution, as we presume that they already do so without our direction.

██ Further, the courts will not issue a writ in anticipation of a supposed omission of a duty, or unless the duty exists at the time the writ is sought. The duties the Petitioners request this court to compel or prohibit are not yet being performed, nor are they capable of performance, until the effective dates of the provisions. In *State ex rel. Hamilton v. Cohn*, 1 Wn.2d 54, 58-59, 95 P.2d 38 (1939) we stated:

> The duty to be enforced by mandamus must be one which exists at the time when the application for the writ is made. The writ will not issue in anticipation of a supposed omission of duty, but it must appear that there has been an actual default in the performance of a clear legal duty then due at the hands of the party against whom relief is sought. Until the time fixed for the performance of the duty has passed, there can be no default of duty.

The court in *Cohn* further stated that a writ will not be granted on the basis of the unconstitutionality of an act until the time the act is effective:

> The courts uniformly hold, on the question whether mandamus should issue where the relator's right to the writ depends on holding an act of the legislature unconstitutional, that the constitutional question will not be decided before the time when the statute is to take effect has arrived and a proper case under the statute is presented.

*Cohn*, at 63 (citing 38 C.J. *Mandamus* § 681, at 920 (1925)). On this basis, the court originally denied the Petition as premature. *Cohn*, at 61-62. Likewise, the writ petition here, insofar as it is based on still inoperative law, is also premature.

The court in *Cohn* distinguished *Acme Fin. Co. v. Huse*, 192 Wash. 96, 194 Wash. 706, 73 P.2d 341, 77 P.2d 595, 114 A.L.R.

1345 (1937), in which the court rendered a declaratory judgment on a statute not yet effective on the grounds that *Acme Fin. Co.* involved a declaratory judgment, not a writ of mandamus, and that the action there was maintainable

> in view of the allegations of the complaint that plaintiff would be damaged by its enforcement in person or property, that the defendant public officer was charged to enforce such statute and about to or would do so, and that such enforcement would infringe the constitutional rights of plaintiff.

*Cohn*, at 62. We acknowledge the further distinction that the statute in *Acme Fin. Co.* was only 1 month away from its effective date and, unlike here, no ambiguities existed as to its operation. We will not diverge from the rule in *Cohn* and compel or prohibit the performance of duties which do not now exist.

■ Finally, mandamus may not be used to compel the performance of acts or duties which involve discretion on the part of a public official. *Vangor v. Munro*, 115 Wn.2d 536, 543, 798 P.2d 1151 (1990); *State ex rel. Pacific Bridge Co. v. State Toll Bridge Auth.*, 8 Wn.2d 337, 342-43, 112 P.2d 135 (1941). We will not usurp the authority of the coordinate branches of government.

The Petitioners claim that the Respondents, Speaker of the House and President of the Senate, have the duties to preside over the Legislature, certainly not an appropriate subject for mandamus, and to certify and sign bills passed. The signing of a bill is not a ministerial task, as it involves a decision regarding the number of votes required for a particular action and whether those votes have been properly cast. In fact, these presiding legislative officers will be required to determine whether Initiative 601 applies to a particular bill if some or all of Initiative 601 remains the law. We will not grant a writ relating to these tasks. *See State ex rel. Davisson v. Bolte*, 151 Mo. 362, 52 S.W. 262 (1899). The Treasurer has the duty to receive, keep, and disburse all the moneys of the state. The Petitioners make no argument that these are merely ministerial tasks. Again, if some of the provisions of the initiative remain in effect, the Treasurer will also need

to determine which disbursements would be in violation of the expenditure limit. The Attorney General is charged with prosecuting violations of the law, a duty which is generally recognized as highly discretionary. We will not tell state officials how to make discretionary decisions in advance, but will refrain from acting until after a state officer has undertaken action under the initiative and there is a claim that the officer has abused his or her discretion.

■ In addition to mandamus, the Petitioners seek relief in the form of a declaratory judgment pursuant to RCW 7.24.010-.020. This court's original jurisdiction is governed by the constitution and, by the plain language of the constitution, does not include original jurisdiction in a declaratory judgment action. The Petitioners themselves do not make the claim that this court has original jurisdiction under the declaratory judgments act, but seek declaratory relief as incidental to the mandamus proceedings. The only grounds on which this court could render declaratory relief regarding a provision of the initiative is if such a declaration necessarily underlies a writ of mandate as to duties under that particular provision. We have already established the impropriety of mandamus in this case.

■■ Even if this court did have original jurisdiction to hear this case as a declaratory judgment action, review would still be improper in that the action is not justiciable at this time. For declaratory judgment purposes, a justiciable controversy is:

> (1) . . . an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive.

*Nollette v. Christianson*, 115 Wn.2d 594, 599, 800 P.2d 359 (1990) (citing *Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 815, 514 P.2d 137 (1973)); *Spokane v. Taxpayers of Spokane*, 111 Wn.2d 91, 758 P.2d 480 (1988). Absent these

elements, the court "steps into the prohibited area of advisory opinions." *Diversified Indus.*, at 815.

Petitioners argue that the 4-part test is met here. It is not. In regard to an actual, as opposed to hypothetical, dispute, most of the provisions of Initiative 601 are not yet in effect. When a statute is not in effect, and when it may be amended by the very persons the Petitioners claim are being harmed, state legislators, we cannot do otherwise than find that this is only a speculative dispute.

As far as direct and substantial harm, the primary harm identified by the Petitioners is that Initiative 601 affects budgetary decisions and long-term fiscal plans. See Ex. O (Declaration of Art Wang); Ex. N (Declaration of Marlin Appelwick); Ex. M (Declaration of Nita Rinehart). These declarations also discuss confusion or concern in the Legislature regarding the initiative, but do not identify how there has been actual, concrete harm to the Petitioners. Indeed, the declarations reveal the purely political nature of the Petitioners' challenge at this time. The main contention of the Petitioners seems to be that the Legislature is having difficulty raising taxes, a political problem which was resolved by the voters when Initiative 601 was enacted to limit the ability of the government to raise taxes.

Furthermore, the Petitioners point to no immediate harm to those Petitioners who are not state legislators. Although the Petitioners who are, for example, students or teachers, may have an interest in funding for state educational institutions, there is no discussion of how these Petitioners are being currently affected or denied some benefit by Initiative 601 which is rightfully theirs.

At this time, there are still many ambiguities regarding the provisions of the initiative. In fact, the Petitioners themselves refer to the confusion regarding the implementation of the initiative. Reply Br. of Pet'rs, at 22; see also Ex. P (Declaration of Helen Sommers), at 2 (stating that "the Initiative's gray areas have made long-term fiscal policy decisions virtually impossible."). The text of the initiative itself is capable of differing interpretations, and it is yet

unclear what is required under some of the provisions. For example, under section 4(1), providing for super majority approval for actions which raise state revenue or require revenue-neutral tax shifts, there is no definition of revenue-neutral shifts. It is uncertain whether debt service is included in the expenditure limitation, an issue which has the potential to impact the budget, but is still undetermined. Ex. O (Declaration of Art Wang), at 2. A major ambiguity is whether the two-thirds vote requirement of section 4(1) applies to general fund taxes only or also to taxes not deposited into the general fund. Ex. R (Memorandum from Narda Pierce, Solicitor General, to assistant attorneys general), at 12. These are but a few examples of the uncertainties in interpreting the initiative, many more of which are contained in the declarations submitted by the Petitioners, and the memorandum from the Solicitor General. Exs. R; O-P. We are not asked to resolve these ambiguities here, but note that they render it difficult to determine whether the initiative does, in fact, have present harmful effects.

Aside from the ambiguities as to the nature of the requirements of the initiative, the potential harmful effects of the initiative may never come to pass. It is possible that acts which are deemed to fall within section 4(1) will pass by two-thirds of the votes and so this greater voting requirement will have no real effect. Perhaps the Legislature can comply with section 4(1), without taking action which will result in expenditures over the expenditure limit, such that no referral to the voters will occur under section 4(2)(a), providing for voter referral for actions under section 4(1) which result in expenditures in excess of the expenditure limit. The course of future events is, at this time, purely speculative and subject to a challenge when a specific dispute arises in regard to a particular bill. Until presented with an existing, fact-specific action, this court will not involve itself in what is an essentially political dispute.

If this court were to speculate, as the Petitioners seem to be asking, and assume that the initiative will cause future harm to the various Petitioners, such as forcing a redefini-

414

tion of basic education, then this court might just as well go one step further and assume that the Legislature will choose to ameliorate these alleged harms by amending the initiative, which it can do now by a two-thirds vote and will be able to do by a simple majority after December 1995. This potential short life, 5 months, militates against an advisory opinion before the legislation even becomes effective.

Therefore, contrary to the Petitioners' assertions, this action does not meet the 4-part justiciability test. A decision at this time would be advisory only. Although courts in some states do render advisory opinions, we do not do so in this jurisdiction. *Washington Beauty College, Inc. v. Huse*, 195 Wash. 160, 164, 80 P.2d 403 (1938).

The Petitioners argue that even if the 4-part justiciability test is not met, the court should follow the "well-established rule that this court will hear matters of great public importance without regard to justiciability." Reply Br. of Pet'rs, at 20. However, the cases relied on by the Petitioners do not provide strong support for their contentions.

The Petitioners rely primarily on a passage from *State ex rel. Distilled Spirits Inst., Inc. v. Kinnear*, 80 Wn.2d 175, 178, 492 P.2d 1012 (1972):

> Where the question is one of great public interest and has been brought to the court's attention in the action where it is adequately briefed and argued, and where it appears that an opinion of the court would be beneficial to the public and to the other branches of the government, the court may exercise its discretion and render a declaratory judgment to resolve a question of constitutional interpretation.

This statement, however, does not refer to review of issues not yet ripe, as timing was not an issue in *Distilled Spirits*. The tax on the sale of liquor challenged in *Distilled Spirits* was already implemented and the taxpayer petitioner had already paid the tax. The above quotation is in answer to the respondent's argument that the court could not examine the legislative process involved in enacting the tax measure because of the "enrolled bill" doctrine. That doctrine holds that an enrolled bill on file, duly signed, and fair upon its face is conclusive evidence of the regularity of the enactment

proceedings, in accordance with the constitution. The court decided to render a declaratory judgment despite the "enrolled bill" doctrine.

Furthermore, the members of the Legislature, the Governor, and the Attorney General also desired an opinion on the constitutional issue presented in *Distilled Spirits*, as it affected a number of legislative acts already passed. This is in stark contrast to the current action, in which the Respondent state officials seek a dismissal. *Distilled Spirits* is easily distinguished from this case where the challenged measures are not yet in effect, where there is no present harm to taxpayers even alleged, much less a tax paid, and where the state officials involved in enforcing the law do not seek an opinion.

In addition to *Distilled Spirits*, the Petitioners claim that our case law is replete with cases of major public import in which this court dispensed with the justiciability test. Reply Br. of Pet'rs, at 20-21. An examination of the numerous cases cited for this claim reveals that not only is this an overstatement, but that even if we do not always adhere to all four requirements of the justiciability test, this court will not render judgment on a hypothetical or speculative controversy, where concrete harm has not been alleged.

The Petitioners cite both *DiNino v. State ex rel. Gorton*, 102 Wn.2d 327, 332, 684 P.2d 1297 (1984) and *Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 815, 514 P.2d 137 (1973). In each of these two cases, this court dismissed the actions as not ripe for review. In *DiNino*, the court refused to render a declaratory judgment as to the constitutionality of the Natural Death Act (RCW 70.122). A woman who was not pregnant and not terminally ill wanted a declaration of the validity of her directive to her physician regarding life-sustaining procedures, which differed from the model directive in the act as far as pregnancy and abortion provisions. Despite the obviously important constitutional rights involved, the court held that there was no justiciable controversy, as the case presented a "hypothetical, speculative controversy". *DiNino*, at 332. The court went on to hold that

without a factual controversy before it, "an advisory opinion would not be beneficial to the public or to other branches of government." *DiNino*, at 332.

The court in *Seattle Sch. Dist. 1 v. State*, 90 Wn.2d 476, 585 P.2d 71 (1978), cited by the Petitioners, did rely in part on the public interest involved in finding that there was a justiciable controversy. That case involved not an unripe claim, but the argument that as an arm of the State, the school district could not be an adverse party to the State. The controversy itself was not in any way speculative or hypothetical.

▮ The Petitioners also cite to *Fritz v. Gorton*, 83 Wn.2d 275, 517 P.2d 911, *appeal dismissed*, 417 U.S. 902, 41 L. Ed. 2d 208, 94 S. Ct. 2596 (1974), in which the appellants alleged, in part, that a provision of a particular initiative had a chilling effect on their First Amendment right to petition the government. In the First Amendment context, a "chilling effect" on First Amendment rights is a recognized present harm, not a future speculative harm, which allows third party standing when the law in question burdens constitutionally protected conduct. *Tacoma v. Luvene*, 118 Wn.2d 826, 827 P.2d 1374 (1992). The present case does not arise in the context of the First Amendment and we will not rely on the claimed "chilling effect" of the legislation on tax increases and expenditures to find present harm.

The Petitioners referred to *Seattle v. State*, 103 Wn.2d 663, 694 P.2d 641 (1985) in their briefs and at oral argument. There this court granted standing to the City to challenge two statutes governing annexation procedures. We pronounced that the City had a "direct interest in the fairness and constitutionality of the process by which it annexes territory", in response to the argument that the City did not have standing to bring an equal protection claim. *Seattle*, at 669. Although this court did state that the requirements for standing are applied more liberally in cases of public import, there was no argument that the controversy was not a present one or that the threatened harm had not yet occurred. The City had already attempted to annex territory, but the

attempts were thwarted twice, each time under the newly enacted statutes the City was challenging in the case. The City had, in fact, been affected by the legislation. This claim cannot be made here.

We fully acknowledge that this court has, on the rare occasion, rendered an advisory opinion as a matter of comity for other branches of the government or the judiciary. In *Citizens Coun. Against Crime v. Bjork*, 84 Wn.2d 891, 529 P.2d 1072 (1975), referred to by the Petitioners, involving the legislative power to override the Governor's veto, this court held that it would render an advisory opinion "[i]n consideration of the comity existing between the judicial and executive branches of the state government". *Citizens Council*, at 895. *See also State ex rel. O'Connell v. Dubuque*, 68 Wn.2d 553, 413 P.2d 972 (1966) (Legislature passed concurrent resolution seeking an adjudication). Here, not only is there no request by the Legislature itself that we adjudicate this case, but the Respondent state officials, of both the legislative and executive branches, seek dismissal of the case.

Again, this court in *Nostrand v. Little*, 58 Wn.2d 111, 361 P.2d 551 (1961), *appeal dismissed*, 368 U.S. 436, 7 L. Ed. 2d 426, 82 S. Ct. 464 (1962) issued an opinion only because the United States Supreme Court directed that it do so. *Nostrand* involved the validity of an act requiring every public employee to subscribe to an oath that he or she was not a subversive or member of the Communist party, arguably a matter of public importance. The court noted that there was no allegation or finding that the professors challenging the oath had refused to take the oath or that they intended to refuse in the future. The court stated that without "such a showing it would seem premature, even in a declaratory judgment action, for a court to rule on a hypothetical situation." *Nostrand*, at 119. The court went on to enter a contingent ruling, based on the hypothetical assumption that the plaintiffs were in a position to raise the issue when the case first came to the court. *Nostrand*, at 119. In the absence of a command from the Supreme Court, we will not enter a ruling based on the hypothetical harm here.

The *Nostrand* case contrasts with the Petitioners' citation to *Huntamer v. Coe*, 40 Wn.2d 767, 246 P.2d 489 (1952), where the challenged statute required an oath or affidavit from candidates for office stating that the candidate was not a subversive. Plaintiffs there stated that they would be prevented from becoming candidates because they could not or would not take the oath. The court adjudicated the question anyway. However, *Nostrand*, decided later, inferred the opposite view on the necessity that the action governed by the challenged statute have occurred before a challenge may be brought. We agree with *Nostrand*.

Thus, the cases cited by the Petitioners do not compel us to reach the conclusion that this court will readily ignore justiciability requirements. We choose instead to adhere to the longstanding rule that this court is not authorized under the declaratory judgments act to render advisory opinions or pronouncements upon abstract or speculative questions. *Washington Beauty College, Inc. v. Huse*, 195 Wash. 160, 164, 80 P.2d 403 (1938). *See also Kitsap Cy. v. Bremerton*, 46 Wn.2d 362, 370, 281 P.2d 841 (1955); *DeGrief v. Seattle*, 50 Wn.2d 1, 14, 297 P.2d 940 (1956); *Brehm v. Retail Food & Drug Clerks Union 1105*, 4 Wn.2d 98, 101, 102 P.2d 685 (1940).

In addition, even if we completely ignored the well-established justiciability rules, this does not mean that the court may issue a declaratory judgment where the court does not have original jurisdiction as provided by the constitution. With the exception of the unusual *State ex rel. Distilled Spirits Inst., Inc. v. Kinnear*, 80 Wn.2d 175, 492 P.2d 1012 (1972) case, in all declaratory judgment cases the Petitioners cite for the proposition that jurisdiction should be exercised broadly, the action began in the superior court and we then granted review.

Much of the briefing of the Respondents and Intervenors is directed to the argument that the Petitioners do not have standing. Because this action fails under the general justiciability standards as discussed, and because we do not have original jurisdiction over this action, we will not

engage in a lengthy analysis of the standing issue. A few points are of note, however.

 The standing doctrine prohibits a litigant from raising another's legal rights. The kernel of the standing doctrine is that one who is not adversely affected by a statute may not question its validity. *Haberman v. WPPSS*, 109 Wn.2d 107, 138, 744 P.2d 1032, 750 P.2d 254 (1987) (citing *Allen v. Wright*, 468 U.S. 737, 750-51, 82 L. Ed. 2d 556, 104 S. Ct. 3315, *reh'g denied*, 468 U.S. 1250, 82 L. Ed. 2d 942, 105 S. Ct. 51 (1984)), *appeal dismissed*, 488 U.S. 805 (1988). None of the Petitioners have alleged concrete harm under the legislation. Legislator Petitioners have not stated what legislation has failed to pass under the enactment process established by the initiative, or what interest they have in that legislation. The citizen Petitioners have not alleged that any benefit has been denied to them at this time. Standing seems to be based only on taxpayer standing.

Here, the initiative purportedly limits expenditures and taxes. According to one declaration, "the Legislature is actively considering tax cuts now." Ex. O (Declaration of Art Wang), at 4. Although this court has frequently recognized taxpayer standing, *State ex rel. Tattersall v. Yelle*, 52 Wn.2d 856, 859, 329 P.2d 841 (1958), and a number of the Petitioners are taxpayers, it is questionable whether taxpayers have standing to protest limits on taxation. *See State ex rel. Smith v. Haveland*, 223 Minn. 89, 93, 25 N.W.2d 474 (1946) (stating that the "mere denial of a desire to be taxed is not an act adverse or hostile to any legal interest"). The affidavits submitted to claim that Initiative 601 is currently causing harm relate only to the problems of government officials. There is no affidavit by a taxpayer relating to harm to taxpayers. Instead, in the Petition, it is repeatedly stated that a given petitioner, as "a taxpayer of the State of Washington" will be "affected by and have an interest in implementation of Initiative 601 and its impact on the state revenue process." Petition, at 4, 6. Although a taxpayer need not allege a personal stake in the matter, but may bring a claim on behalf of all taxpayers, *Tacoma v. O'Brien*, 85 Wn.2d 266,

269, 534 P.2d 114 (1975), it is more questionable whether taxpayer standing is appropriate to protest legislation which, by the Petitioners' own claims, will decrease state expenditures and make the raising of taxes more difficult. Nevertheless, even if this court were to hold that the Petitioners had standing, this action is still not justiciable at this time for the reasons given above.

For clarity, we reiterate that the discussion until this point has been directed at those sections of the initiative not yet in effect. We now move on to examine the issues surrounding sections 8 and 13.

Section 8, currently in effect and which will remain in effect, provides that "[n]o fee may increase in any fiscal year by a percentage in excess of the fiscal growth factor for that fiscal year without prior legislative approval." Laws of 1994, ch. 2, § 8, p. 23. The Petitioners are challenging section 8 on the grounds that in limiting the fee-setting authority of administrative agencies, the initiative did not set out all the fee-related statutes which would be "amended" by this provision.

Despite the fact that section 8 is in effect, Petitioners' challenge to section 8 is not justiciable as brought. A great deal of additional briefing would be necessary to bring a viable challenge to section 8. For example, although the Petitioners provide a list of fee statutes they claim are amended by section 8, some of these statutes may not actually come within the purview of section 8. See Br. of Resp'ts, at 44 n.23. The Petitioners make no argument at all regarding these statutes and whether each one has, in fact, been amended by section 8, but merely give cites to hundreds of statutes. We do not wish to address a matter which is not specifically briefed, and is completely unsupported by adequate argument. *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 345, 779 P.2d 249 (1989). We certainly will not, on our own, analyze each and every statute referred to by the Petitioners to determine whether section 8 has improperly amended the statute. That task is for the Petitioners to undertake.

Furthermore, the Petitioners can assert no harm to themselves or others. The Petitioners have not claimed that state agencies have been unable to increase fees, nor is there a claim that section 8 has impeded an agency's ability to raise fees. According to the Respondents, at least three agencies have obtained permission to raise fees. Br. of Resp'ts, at 6. Thus, the Petitioners identify no concrete harm.

The Petitioners do not allege interest in any particular fees. None of the Petitioners claim to be responsible for imposing fees, nor claim to be the beneficiaries of services provided by the fees. As to those Petitioners who claim taxpayer standing, there is no claim as to how section 8 will affect the expenditure of state funds or will cause them to pay higher taxes.

In addition, there is no pleading relating to the nature of the writ of mandamus being requested to bar implementation of section 8. No official has been identified. The only remedy which the Petitioners appear to seek in regards to section 8 is a declaration that the section is unconstitutional. We have no original jurisdiction to issue such a declaratory judgment. In short, the Petitioners have identified no grounds on which mandamus could issue based on the facts and allegations presented.

We will not hear a challenge to section 8 of the initiative as "incidental" to the Petitioners' other claims, as the Petitioners urged at oral argument and in the briefing. In *Yelle v. Bishop*, 55 Wn.2d 286, 347 P.2d 1081 (1959), cited by the Petitioners at oral argument, this court considered a claim similar to the one the Petitioners make regarding section 8, as part of a declaratory action by the State Auditor challenging the constitutionality of an act creating a new budget and accounting system. The fact that in *Yelle* this court considered the claim that the budgetary and accounting act had improperly amended prior law, along with its review of the Auditor's other claims, does not mean that this court will hear a similar claim in this case. In *Yelle*, the entire action was properly before the court: all the challenged provisions were in effect; the Auditor had an interest in the entire act

as it affected the operation of his office; and, the claim was properly brought in superior court as a declaratory judgment action. Here the claim is being brought in on the shirttail of a mandamus action, which is improperly before us in the first place. Further, the Petitioners cannot cite to the same interest in the operation of section 8 as the State Auditor could point to in *Yelle*.

In sum, the record here is inadequate to fashion any kind of relief in regards to section 8 under the court's original mandamus jurisdiction, or to provide declaratory relief.

The other provision currently in effect, section 13, provides:

> After the effective date of this section, the state may raise existing taxes, impose new taxes as authorized by law, or make revenue-neutral tax shifts only with approval of a majority of the voters at a November general election. . . .

Laws of 1994, ch. 2, § 13, pp. 23-24. The Petitioners claim that there are four bills passed by the Legislature which may fall under section 13, although they provide no analysis of whether the bills are, in fact, subject to section 13. Indeed, three out of the four bills do not, by their own terms, fall under the ambit of section 13 at this time. Those three bills, Engrossed Substitute House Bill 2326, Substitute Senate Bill 6307, and Engrossed House Bill 2670, go into effect without voter referral, unless a court declares that referral would be necessary in order to comply with Initiative 601. Br. of Pet'rs, at 39-40. There is no indication that any of these three bills are the subject of a court action to rule whether they are within the ambit of Initiative 601 and certainly they are not before us now to make such a determination.

The only bill which is at this time subject to voter referral is Engrossed Second Substitute House Bill 2319 (E2SHB 2319). However, the Petitioners themselves appear to doubt that they have a clear case for a writ directed at referral of E2SHB 2319, in that they state only that "[f]our of the measures passed during the session were revenue measures arguably within the ambit of Initiative 601." Br. of Pet'rs, at

39. Although only one of the bills is possibly subject to the referral provisions of section 13 at this time, the Petitioners state in their brief that the writ should direct the Secretary of State not to certify any of the "measures recently enacted by the Legislature in its 1994 session" to the ballot. Br. of Pet'rs, at 42. Such a writ would be based only on speculation as far as three of the four bills.

No writ directed at E2SHB 2319 is requested in the Petition, and in the Petition itself, the requested relief is that the Secretary of State adhere to the constitution. After E2SHB 2319 passed, the Petitioners might have amended the Petition to specifically request a writ directed at the referral of this bill. They did not do so. We have held that the writ cannot be any more specific than the petition. *State ex rel. Pacific Am. Fisheries v. Darwin*, 81 Wash. 1, 12, 142 P. 441 (1914). Without a request in the petition for a specific writ directed to prohibit the Secretary of State from certifying E2SHB 2319 to the ballot, we will not, on our own, craft such a remedy.

Furthermore, the only officer with any duty under E2SHB 2319 and section 13 of Initiative 601 is the Secretary of State. Nevertheless, the Petitioners are seeking a writ directed at four state officers, compelling compliance with the constitution. As stated above, we will not issue such a broad and indefinite order.

The ambiguities surrounding E2SHB 2319 and section 13 further reveal the impropriety of review at this time. The grounds on which the Legislature is referring the bill are not clear. Section 911 of E2SHB 2319 refers the bill "in accordance with Article II, section 1 of the state Constitution, as amended, and the laws adopted to facilitate the operation thereof . . .". Ex. D, at 201. Referring a bill to the voters is a constitutional power of the Legislature, and we will not interfere with that power. The referral then contains the proviso of "unless section 13, chapter 2, Laws of 1994 [Initiative 601], has been declared invalid or otherwise enjoined or stayed by a court of competent jurisdiction." Ex. D, at 201. The Petitioners do not address the validity of such

a conditional referral and we are unclear as to its effect on a writ of mandamus.

Another ambiguity is that the tax provisions of E2SHB 2319 are not currently effective, but will only go into effect on July 1, 1995. Sections 901, 902 and 903 of E2SHB 2319 remove the July 1, 1995, time limit for certain taxes to expire, thereby extending the taxes indefinitely. Section 904 removes a time limit on the tax of cigarettes and increases the amount of tax. Sections 905 through 907 make changes to the tax on carbonated beverages and syrup. Sections 904 to 908 do not take effect until July 1, 1995. It is not clear what effect Initiative 601 has on a bill currently passed, but which raises taxes as of July 1, 1995. Legislation passed now, raising taxes in the future, may be conceived of as a way to raise taxes in the future, without then subjecting the legislation to a super majority requirement, as would a tax bill passed after July 1, 1995. It is unclear whether this is a permissible method to avoid the strictures of Initiative 601.

Finally, a writ directed to E2SHB 2319 and section 13 would not bring the rest of the Petitioners' claims before the court. Petitioners state that declaratory and injunctive relief should be granted as incidental to a writ of mandamus and quote the following passage: "If any part of the relief to which the petitioner is entitled is by writ of mandamus the court will try out all incidental questions in the mandamus proceeding." *State ex rel. Gillette v. Clausen,* 44 Wash. 437, 443, 87 P. 498 (1906). Petitioners are reading this statement incorrectly and out of context. An examination of *Clausen* shows that the above comment refers to questions incidental to the specific issue subject to the mandamus proceeding. This statement is followed by a discussion of how facts may be controverted, a trial may be had on the issues of fact raised, and damages and costs may be awarded. The court was simply explaining that complete relief may be granted in a mandamus proceeding, even though it is an extraordinary remedy. The point was that a mandamus proceeding has all the elements of a civil action. *Clausen,* at 443. The statement does not stand for the proposition that if the Petitioners have

a proper action for a writ of mandamus, other matters may also be resolved, where those matters are not part of the issue to be remedied by mandamus. If a matter is subject to a writ of mandamus, then a declaration of the validity of the law regarding that specific matter or injunctive relief may also issue, but only as to the issue involved in the mandamus action. One issue properly before the court does not carry with it any number of other issues which would otherwise be dismissed for lack of an essential element.

Therefore, even if mandamus were granted as to E2SHB 2319 and section 13, this court could not reach other, unrelated issues, where those issues would not be subject to a mandamus action, but are simply contained in the same act. Section 13 does not involve the super majority requirement, but only voter referral. E2SHB 2319 passed with a simple majority. Because consideration of a referral under section 13 does not implicate the Petitioners' major contentions regarding the super majority requirement, we could only give an advisory opinion as to this portion of the action. We will not do so. *Washington Beauty College, Inc. v. Huse*, 194 Wash. 160, 164, 80 P.2d 403 (1938).

In sum, the referral of one bill under section 13, a bill which passed by a simple majority, is not enough to grant a writ directed at the four state officers named and not enough to reach most of the substance of the Petitioners' claims. The Petitioners only summarily argue that E2SHB 2319 is referred pursuant to section 13, and make that argument in conjunction with the specious argument that three other bills are subject to section 13. Out of 10 briefs and over 200 pages of briefing, the discussion of this bill is no more than a handful of lines in a few briefs, and no mention of the bill is made in the Petitioners' Reply Brief, despite the lengthy arguments on the motion to dismiss made in the opposing parties' briefs. This is far too slim a reed on which to hang major challenges to the entirety of an initiative, most of which is not yet in effect. The Petitioners have filed no amended petition asking for relief directed specifically at the referral of E2SHB 2319. We are not even sure that the

referral is pursuant to section 13. Thus, we will not entertain this entire action on the basis of E2SHB 2319 and section 13 of Initiative 601.

This original action is improperly before this court on application for a writ of mandamus and further, is not justiciable at this time. We dismiss the action.

ANDERSEN, C.J., and DOLLIVER, DURHAM, SMITH, GUY, and MADSEN, JJ., concur.

UTTER, J. (dissenting) — This case presents several issues which, if resolved, would not only provide essential guidance to legislators whose current decisions are heavily dependent on the viability of Initiative 601, but would assist the government and public in understanding how and if an initiative can amend the state constitution. I, therefore, cannot agree with the majority's failure to address the merits of this case. To restart this case at a later date would develop no new facts necessary to decide this issue and wastes judicial resources.

The Petitioners seek a writ of mandamus, barring five state officials from engaging in various activities mandated by Initiative 601, on the basis certain provisions of the initiative are unconstitutional. Specifically, the Petitioners challenge portions of sections 13, 8, 4, and 3 of Initiative 601 as unconstitutional. Based on binding legal authority and acknowledgement of the broad overriding import of the issues presented, I would review the merits of each of these challenges.

My foremost disagreement with the majority is over its dismissal of Petitioners' challenge to section 13 of the initiative. The majority's dismissal of this claim is raised sua sponte, is premised on two untenable grounds, and fails to apply the ordinary test of justiciability.

Section 13 requires the State to certify any bills which contain changes to the tax structure to the general ballot for approval by a majority of the voters:

the state may raise existing taxes, impose new taxes as authorized by law, or make revenue-neutral tax shifts *only with approval of a majority of the voters at a November general election.*

(Italics mine.) Initiative 601, § 13(1). The Petitioners allege this provision violates Const. art. 2, § 1(b)[1] as well as Const. art. 7, § 1.[2]

Even assuming the issue of justiciability was properly raised,[3] I cannot agree with the majority. The majority advances, in essence, two reasons for dismissing the claim. First, it concludes the claim is not yet justiciable mainly because it argues three of four bills mentioned by the Petitioners as falling within the ambit of section 13 do not actually fall within the scope of section 13 and because the fourth bill contains ambiguities. Second, the majority appears to conclude that because the Petitioners have failed to request a writ specifically directed at any bill or state official, this court is without the authority to craft so specific a remedy.

Neither premise is supportable. First, the status and substance of the four bills are inapposite to the issue presented here. The real issue is: Should section 13 — triggering immediate and direct obligations on Ralph Munro, burdening taxpayers who financially support Munro's office and the

---

[1]Const. art. 2, § 1(b) provides: "The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions, either by petition signed by the required percentage of the legal voters, or by the legislature as other bills are enacted . . .."

[2]Const. art. 7, § 1 provides in relevant portion: "The power of taxation shall never be suspended, surrendered or contracted away".

[3]I note my strenuous objection to the majority's decision to raise the issue of justiciability sua sponte. First, Respondents do not contest justiciability of this claim in their briefs. See Br. of Resp'ts, at 42-49 (only challenging claims relating to sections 8, 4, and 3), and Reply Br. of Resp'ts, at 6-7 (describing section 13 as "arguably ripe for review", "currently control[ling] the procedure for the enactment of" a bill and standing "[i]n contrast" to those sections of the initiative not in effect until July 1, 1995). Moreover, the facts of this case, evidencing current and momentous consequences of failing to address the merits of the Petitioners' section 13 claim, conflict with the majority's decision to raise the issue of justiciability sua sponte.

operation of elections, and impeding the work of legislators who are currently functioning under the effect of section 13 — be reviewed? The answer to this question is yes, irrespective of the status or substance of the bills discussed by the Petitioners.

Even if the substance of the bills subject to section 13 were germane to the determination whether a challenge to section 13 of Initiative 601 is justiciable, the reasons given by the majority for finding a lack of justiciability are unpersuasive. The majority notes that because three of the four bills go into effect without voter referral, unless a court declares referral is required under Initiative 601, they do not fall within the ambit of section 13. As a point of fact, only two of the four bills, SSB 6307 and ESHB 2326, contain a provision which indicates voter referral is unnecessary unless a judicial declaration to the contrary is issued. One of the remaining two bills, EHB 2670, may be subject to the requirement of voter referral;[4] and the other, E2SHB 2319, is subject to voter referral and thus supports justiciability of Petitioners' section 13 claim.

Ignoring EHB 2670, the majority charges that because E2SHB 2319 is "ambiguous", Petitioners' section 13 claim is not yet justiciable. Its claim of ambiguity is unfounded. One alleged ambiguity is the fact the tax measures of E2SHB do not become effective until July 1, 1995. As noted, the fact the tax provisions of E2SHB 2319 do not go into effect until July 1, 1995, is inapposite to the justiciability of *Section 13*. That section of the initiative triggers immediate and direct obligations on Munro, burdens taxpayers who financially support Munro's office and the process of elections, and burdens the legislators who are currently operating under the effect of section 13.

The other alleged ambiguity is quite curious in the context of the majority's overall opinion. According to the major-

---

[4]Petitioners argue the proposed increase in the amount of the principal residence tax exemption for qualifying individuals (effectively reducing their taxes) will have the inevitable effect of raising taxes for others, and therefore represents a revenue-neutral tax shift which must be subject to voter referral.

ity, the presence of a provision which stipulates the bill will be referred to the general population unless a court declares Initiative 601 invalid renders E2SHB 2319 ambiguous. The majority remarks just a few pages earlier that other bills, which become effective without voter referral unless a court declares referral would be necessary to comply with Initiative 601, should be interpreted as being effective without voter approval since there is no allegation the alternative procedure has been triggered. See majority, at 422. Thus, according to the majority, in the absence of an allegation an alternative enactment procedure has been triggered by a specified event, the original procedure stipulated by the statute governs. The majority's claim E2SHB 2319 is ambiguous by virtue of the existence of a conditional referral provision, therefore, is, by the majority's own reasoning, insupportable.

The majority's contention the Petitioners have failed to request a writ with adequate specificity is similarly indefensible. The assertion contradicts legal authority as well as the record. The majority writes: "Without a request in the Petition for a specific writ directed to prohibit the Secretary of State from certifying E2SHB 2319 to the ballot, we will not, on our own, craft such a remedy". Majority, at 423. The record contradicts the assertion the request is not sufficiently specific. In the original petition, the Petitioners requested a "writ of mandamus . . . to prohibit [Respondents] from implementing and enforcing Initiative 601". Pet. for Writ of Mandamus and for Declaratory J. and Inj. Relief, at 1-2. The Respondents include Munro. One of Munro's obligations under Initiative 601 is to refer bills falling within the ambit of section 13 to the voters. In addition, in their brief, Petitioners state: "in the case of the measures recently enacted by the Legislature in its 1994 session, Respondent Munro must be directed not to certify *any* of them to the ballot . . .". Br. of Pet'rs, at 42.

Moreover, the legal authority underlying its assertion the Petitioners do not seek relief with adequate specificity does not control the resolution of the issues raised by this case. In

*State ex rel. Pacific Am. Fisheries v. Darwin*, 81 Wash. 1, 142 P. 441 (1914), this court noted the petitioners:

> do not ask for the performance of any specific act. The most they ask is that this court define the duties of the fish commissioner and compel him to perform them as thus defined. But, as we have attempted to show, this is not the province of any court, much less the province of a court of revisory and appellate jurisdiction.

*Pacific Am. Fisheries*, at 12. In contrast, Petitioners here do not seek judicial definition of the scope of the Respondents' duties, but rather a writ enjoining state officials from engaging in the specific actions mandated by Initiative 601. Moreover, whereas the court in *Pacific Am. Fisheries* expressly noted the case "present[ed] no unusual or extraordinary conditions", *Pacific Am. Fisheries*, at 13, the case before this court affects all citizens of this state in a current, far-reaching, and profound manner, thereby reflecting an unusual and extraordinary circumstance which deserves immediate judicial attention.

The majority also neglects to apply the general test of justiciability. For purposes of declaratory judgment actions, the following must generally exist:

> (1) . . . an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive.

*Nollette v. Christianson*, 115 Wn.2d 594, 599, 800 P.2d 359 (1990) (quoting *Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 815, 514 P.2d 137 (1973)). The majority's failure to apply this test explicitly results in its consequent failure to reach the proper conclusion Petitioners' section 13 claim satisfies the test. An actual dispute exists since section 13 has already been enacted and imposes immediate obligations on Secretary of State Munro, including the obligation to certify bills to the public. *Clark Cy. Sheriff v. Department*

*of Social & Health Servs.*, 95 Wn.2d 445, 626 P.2d 6 (1981) (writs of mandamus may be directed toward future acts).[5]

Second, at least some of the parties have genuine and opposing interests. The state officials, including Munro, have a genuine interest in upholding the constitutionality of section 13 and certifying bills subject to it for a vote by the public; and the Petitioners on the other hand have a genuine interest in preventing the expenditure of state resources on certifying bills to the public and taking a public vote if the authority pursuant to which such actions are demanded is void.

Third, the interests of at least some of the parties are direct and substantial. Munro's interest is direct and substantial since he is the individual who must certify bills pursuant to section 13. The taxpayer Petitioners have direct and substantial interests in the expenditure of state resources. The legislator Petitioners have direct and substantial interests in abandoning their current approach toward the introduction and enactment of legislation, an approach which they claim is currently premised on unconstitutional demands. Representative Appelwick's affidavit reflects that "[t]he requirement of submission of revenue enhancement measures to public vote has had a chilling effect on taking legislative action which would otherwise have proceeded in the normal course". Decl. of Appelwick (Facts Ex. N), at 2.

Finally, a judicial determination would be conclusive because it would either permit the section to stand as is, relieving legislators and the public from the uncertainty around the parameters of section 13 of Initiative 601, or conclusively void the section, rendering unconstitutional referrals of bills to the public as well as unconstitutional

---

[5]The majority contends *Clark Cy. Sheriff* was premised in part on the fact the official against whom the mandate was directed had engaged in infringing behavior on many occasions in the past. See majority, at 408. However, the holding was simply that because a precise statutory duty existed, because the writ could be worded specifically, and because the command to act did not vary according to circumstances, a writ was appropriate. The same circumstances exist here.

restrictions on the Legislature's power to tax no longer necessary.

The Petitioners' section 13 claim is also justiciable under a second important test. Under appropriate circumstances, this court has employed a "broad overriding public import" test of justiciability to reach the merits of various issues which are not otherwise justiciable. *See, e.g. Seattle v. State*, 100 Wn.2d 232, 668 P.2d 1266 (1983); *Citizens Coun. Against Crime v. Bjork*, 84 Wn.2d 891, 529 P.2d 1072 (1975); *Huntamer v. Coe*, 40 Wn.2d 767, 246 P.2d 489 (1952). Under this test, a court may, in its discretion, analyze a question not otherwise properly before the court where:

> . . . the question is one of great public interest and has been brought to the court's attention in the action where it is adequately briefed and argued, and where it appears that an opinion of the court would be beneficial to the public and to the other branches of the government . . ..

*State ex rel. Distilled Spirits Inst., Inc. v. Kinnear*, 80 Wn.2d 175, 178, 492 P.2d 1012 (1972); *Seattle Sch. Dist. 1 v. State*, 90 Wn.2d 476, 585 P.2d 71 (1978). The majority attempts to distinguish away a whole line of cases supporting this principle. However, the cases collectively stand for the proposition that, under appropriate circumstances, this court may exercise its discretion in favor of reaching an issue which is not otherwise justiciable. If *Distilled Spirits* and other cases like it are indeed anomalous as the majority suggests, such anomalous nature in no way renders the authority nonbinding. Rather, the anomalous nature of such cases characterizes the legal precedent as authority to be used in anomalous situations demanding immediate attention for the benefit of the public such as the one currently before the court.

The Petitioners' section 13 claim is based on a law which is already in effect, involves the expenditure of state resources on certifying bills and placing them on a statewide ballot, and has been briefed extensively by the parties, intervenors, and amici. Moreover, a conclusive resolution would be extremely beneficial to the public and to officials of the

other branches of government, including the Attorney General, the Secretary of State, the Speaker of the House, the President of the Senate, and the State Treasurer. Accordingly, I would review this claim not only pursuant to the 4-part test of justiciability but also pursuant to this court's discretion to reviews claims of broad overriding public import.

Because of the vast public interest at stake and pursuant to the broad overriding public import test, I would also review Petitioners' claims involving sections 8, 4, and 3. Section 8 provides:

> No fee may increase in any fiscal year by a percentage in excess of the fiscal growth factor for that fiscal year without prior legislative approval.

The Petitioners claim this provision violates Const. art. 2, § 37 which provides "No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length". Petitioners' section 8 claim is based on a provision of the initiative which is already enacted and currently in effect. In addition, the claim implicates the state coffers as well as services for the citizenry of this state, and has been briefed extensively by the parties, intervenors, and amici. I disagree with the majority's suggestion the Petitioners should have "analyzed" each amended statute individually. The allegation is simple and needs no specific "analysis". Finally, because the security and reliability of budgetary planning as well as other legislative decisions would be enhanced, a conclusive resolution would be extremely beneficial to the public and other branches of the government.

Sections 4 and 3 of the initiative require approval by two-thirds of the members of each house of the Legislature before various measures may be taken. Petitioners claim the super-majority requirements of these two sections violate Const. art. 2, § 1(b) (see footnote 1), Const. art. 2, § 22,[6] and

---

[6]Const. art. 2, § 22 provides: "No bill shall become a law unless on its final passage the vote be taken by yeas and nays, the names of the members voting

Const. art. 7, § 1 (see footnote 2). The public benefit to securing a prompt and determinative decision on the constitutionality of sections 4 and 3 is enormous. The claim is one of great public interest because it involves allegations of improper limitations on the appropriation and use of state coffers. The claims based on both sections have been extensively briefed by the parties, intervenors, and amici. Finally, an opinion would be extremely beneficial to both the public and to other branches of government. Because legislators are representatives who are paid by the public to further its collective interests and who must currently introduce and take positions on legislation which will imminently be subject to a super-majority requirement, the provisions have a current and allegedly deleterious effect on legislation being proposed. I take issue with the majority's claim "[i]t is possible that acts which are deemed to fall within section 4(1) will pass by two-thirds of the votes and so this greater voting requirement will have no real effect". Majority, at 413. The legislator Petitioners have claimed the law has already had a "chilling effect" on the nature and substance of legislation proposed. There is therefore no need to also show that a piece of proposed legislation has failed the super-majority requirement. In addition, the security and reliability of budgetary planning as well as other legislative decisions would be greatly enhanced by an opinion from this court. In particular, it would be enormously helpful to Brian Ebersole and Joel Pritchard who Petitioners allege face a conflict between Const. art. 2, § 32 and Const. art. 2, § 22 on the one hand, and sections 3 and 4 of the initiative on the other hand.

In sum, I cannot agree with the majority's decision to avoid the merits of Petitioners' challenge to section 13 of the initiative. Nor can I agree with the majority's decision with respect to the challenges to sections 8, 4, and 3 which decision fails to recognize the broad overriding import of the issues presented and the fact the initiative may be operating

---

for and against the same be entered on the journal of each house, and a majority of the members elected to each house be recorded thereon as voting in its favor."

as an impermissible departure from our time-tempered methods of amending the constitution.

JOHNSON, J., concurs with UTTER, J.