# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| WASHINGTON STATE ASSOCIATION OF COUNTIES, a Washington non-profit association; LINCOLN COUNTY, a political subdivision of the State of Washington; PACIFIC COUNTY, a political subdivision of the State of Washington; and YAKIMA COUNTY, a political subdivision of the State of Washington, | No.  60179-6-II |
| Appellants, | |
| v. | PUBLISHED OPINION |
| STATE OF WASHINGTON, | |
| Respondents. | |

PRICE, J. — This case involves a constitutional challenge to the way criminal defense for indigent defendants is funded in this state.  Currently, the State pays only a small percentage of these costs.  *See* RCW 10.101.050, .060; RCW 43.330.190.  Washington's counties are responsible for providing the remainder of the funding for indigent defense services.

These indigent defense services must meet certain standards.  Counties must adhere to guidelines regarding attorney compensation, caseload limits, attorney monitoring, attorney qualifications, and attorney training and are responsible for implementing these guidelines and creating and administering local indigent defense services within their county.  RCW 10.101.030.

No. 60179-6-II

Washington State Association of Counties,[1] Lincoln County, Pacific County, and Yakima County (collectively "the Counties") have brought this action against the State claiming that the funding system for indigent defense services is unconstitutional. The Counties allege that the system does not provide sufficient funding for their indigent defense services to meet constitutional standards. Additionally, the Counties allege that there are gross disparities among their abilities to raise funding for indigent defense, which adversely affects poorer counties. These systemic deficiencies, according to the Counties, violate equal protection and the right to counsel in the state and federal constitutions.

The Counties' complaint seeks both declaratory judgment and a permanent injunction. The permanent injunction would require the State to provide adequate funding for indigent defense services.

The State moved under CR 12(b)(6) to dismiss the Counties' complaint on the basis of standing. The State argued that the complaint was premised on rights held by individual defendants, not the Counties, and that even if the Counties had standing, the superior court could not issue a permanent injunction without violating separation of powers principles.

Without reaching the issue of the permanent injunction, the superior court agreed with the State that the Counties lacked standing, and it dismissed the Counties' complaint with prejudice.

Our task is not to adjudicate the merits of the Counties' complaint nor to offer opinions about the desirability of the current system of funding indigent criminal defense in our state. Our

---

[1] Washington State Association of Counties is a coordinating agency for county legislative authorities, authorized by RCW 36.32.350.

2

sole task is to determine whether the Counties have standing to bring their claims. We hold that they do. Accordingly, we reverse the superior court and remand for further proceedings.

FACTS

Before discussing the parties' dispute, we begin with a brief background about the right to counsel and the administration of indigent defense services in Washington.

## I. RIGHT TO COUNSEL

The Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the assistance of counsel for his defense." The right to counsel is a fundamental right, and thus, it imposes an obligatory duty on to the states to provide counsel to indigent defendants through the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 342-44, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); *Luis v. United States*, 578 U.S. 5, 11, 136 S. Ct. 1083, 194 L. Ed. 2d 256 (2016).

Similarly, article I, section 22 of Washington's constitution guarantees, "In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel . . . ." And article I, section 3, mirroring the Fourteenth Amendment, provides, "No person shall be deprived of life liberty, or property, without due process of law." WASH. CONST. art. I, § 3.

Our Supreme Court has declared that the right to counsel is of "paramount importance to all persons appearing in our courts." *City of Seattle v. Ratliff*, 100 Wn.2d 212, 218, 667 P.2d 630 (1983). Due to its fundamental nature, it is not enough that the State refrain from interfering with a criminal defendant's ability to obtain criminal legal counsel; the right to counsel requires the State to actively provide criminal defense services to those who cannot afford it. *See Davison v. State*, 196 Wn.2d 285, 293, 466 P.3d 231 (2020) ("The State plainly has a duty to provide indigent

public defense services—both our state and federal constitutions guarantee the accused the right to counsel.").

Moreover, the right to counsel is essential to principles of due process and the right to a fair trial. *Gideon*, 372 U.S. at 340-42. The right to counsel protects not only the rights of individual defendants but also the legitimacy of the adversary process. *Kimmelman v. Morrison*, 477 U.S. 365, 374, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."). Thus, its protection is not only the State's obligation owed to criminal defendants, it is also a legitimate interest of government itself. *See Singer v. United States*, 380 U.S. 24, 36, 85 S. Ct. 783, 13 L. Ed. 2d 630 (1965) ("[T]he Government . . . has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before the tribunal which the Constitution regards as most likely to produce a fair result.").

II. ADMINISTRATION OF INDIGENT DEFENSE SERVICES IN WASHINGTON

In Washington, the State's duty to "safeguard the right to counsel" is shared among the legislative, executive, and judicial branches, as well as political subdivisions. *Davison*, 196 Wn.2d at 295; RCW 10.101.005. Thus, counties and cities also have a constitutional duty alongside the State to ensure criminal defendants have the right to counsel and the right to a fair trial. *Davison*, 196 Wn.2d at 295; RCW 10.101.005.

Indeed, counties and cities are largely responsible for the administration of indigent defense services. *Davison*, 196 Wn.2d at 289 ("Our legislature has delegated the duty to enforce the right

to counsel to local governments—counties and cities."). For example, RCW 10.101.030 mandates that cities and counties "adopt standards for the delivery of public defense services" that include:

> Compensation of counsel, duties and responsibilities of counsel, case load limits and types of cases, responsibility for expert witness fees and other costs associated with representation, administrative expenses, support services, reports of attorney activity and vouchers, training, supervision, monitoring and evaluation of attorneys, substitution of attorneys or assignment of contracts, limitations on private practice of contract attorneys, qualifications of attorneys, disposition of client complaints, cause for termination of contract or removal of attorney, and nondiscrimination. . . .

In addition to being responsible for administering constitutionally adequate indigent defense services, counties are also responsible for funding the majority of these services. " '[T]he general rule is that counties are burdened with the cost of administering the criminal laws within their boundaries and, in the absence of statutory authority, are not entitled to reimbursement from the State.' " *Thurston County ex rel. Snaza v. City of Olympia*, 193 Wn.2d 102, 104-05, 440 P.3d 988 (2019) (alteration in original) (quoting *State v. Agren*, 32 Wn. App. 827, 828, 650 P.2d 238 (1982)). The State is required to provide indigent defense funding only in the context of specific grant or reimbursement programs, which allow counties to apply for funding that goes toward expenses only related to "improving the quality of public defense services" or related to aggravated murder cases. *See* RCW 10.101.050, .060; RCW 43.330.190.

Our Supreme Court has recognized that there may be flaws in the statutory scheme for indigent defense. In *Davison*, the court commented that the high number of ineffective assistance of counsel claims "might be a symptom of structural problems with [Washington's] current state system governing indigent public defense." 196 Wn.2d at 303 n.7. The court also noted that despite counties and cities bearing the brunt of financing indigent defense services, "the legislature retains ultimate responsibility for drafting a statutory scheme that sufficiently safeguards the

constitutional right to counsel." *Id.* at 300.[2] Even more recently, when ordering reduced caseload maximums for indigent defense attorneys, our Supreme Court described public defense in Washington to be in a "crisis" that "requires action now . . . to support quality defense representation at every level." *In re Standards for Indigent Defense Implementation of CrR 3.1, CrRLJ 3.1, and JuCR 9.2*, Ord. No. 25700-A-1644, at 2 (Wash. Jun. 9, 2025), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/Order%202570 0-A-1644.pdf.

III. THE COUNTIES' COMPLAINT AND ITS DISMISSAL BY THE SUPERIOR COURT

In September 2023, the Counties filed a complaint against the State to challenge this statutory scheme for funding indigent defense. The complaint alleges that the funding scheme violates the right to counsel under the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 3, and 22 of the Washington State Constitution and violates the equal protection provisions guaranteed by the Fourteenth Amendment to the United States Constitution and article I, section 12 of the Washington Constitution.

The complaint alleges that the State "delegates the vast majority of trial court indigent defense obligations to counties" and, under the current system, over 96 percent of the cost of trial court indigent defense is paid for by counties. Clerk's Papers (CP) at 4. This, combined with limits on county taxing authority, "systematically fails to provide counties across Washington with

---

[2] The *Davison* concurrence also called attention to multiple legislative initiatives seeking to improve public defense dating back to the 1980s, multiple articles "documenting chronic public defense deficiencies," and lawsuits brought against counties for "systematically failing to provide adequate public defense," observing that "[t]he State has known for a long time" that the current statutory public defense scheme "has often led to the systematic deprivation of effective assistance of counsel." 196 Wn.2d at 304-05 (González, J., concurring).

the authority and means necessary to furnish constitutionally adequate indigent defense services and denies indigent defendants equal access to justice." CP at 4. In support of this claim, the complaint cites to numerous reports, dating back over 30 years, that detail the negative impacts of Washington's statutory scheme for indigent defense.[3]

The complaint also alleges that the current funding scheme impacts indigent criminal defendants differently "based solely on their ability to pay and/or the jurisdiction where they are charged," creating inadequacies and disparities that "infring[e] on their fundamental right to counsel." CP at 34. It highlights disparities among counties for funding indigent defense services, citing differences in indigent defense budgets, attorney salaries, and oversight. For example, the complaint alleges that Washington's counties that have the most resources spend an average of $3,463 per case, which is over two times the average amount spent per case statewide. "At the other end of the spectrum, . . . spending per case is about $737—about half the statewide average." CP at 19. Similarly, compensation for indigent defense attorneys can vary from $40 to $125 per

---

[3] Among other reports, the complaint cites findings from a legislative taskforce in 1988 that found that extremely high caseloads, local concerns over increasing public defense costs, and variances of public defense standards "threatened the 'continued delivery of services to meet minimum constitutional requirements.' " CP at 20, 212, 269 (quoting OFF. OF ADM'R FOR CTS., INDIGENT DEFENSE IN WASHINGTON STATE: 1990 REPORT OF THE INDIGENT DEFENSE TASK FORCE 1 (June 1990) [https://perma.cc/8JQK-P2VA]). The task force recommended that the State fund up to 50 percent of indigent defense costs. Another report cited was a 2003 report from the Washington Office of Juvenile Justice and others that found that " 'the quality of counsel a child encounters depends significantly on where he or she lives,' and not[ed] that most counties had failed to adopt and/or implement and enforce standards for delivery of public defense as required under [Washington law]." CP at 24, 212, 552 (quoting ELIZABETH M. CALVIN, AM. BAR ASS'N, WASHINGTON: AN ASSESSMENT OF ACCESS TO COUNSEL AND QUALITY OF REPRESENTATION IN JUVENILE OFFENDER MATTERS 45 (Oct. 2003) [https://perma.cc/V6AS-D4DB]). The report also concluded that " '[i]ncreasingly limited state and local funding [was] affecting the availability of investigation funding for juvenile cases.' " CP at 24, 212, 552 (quoting CALVIN, *supra*, at 31). Copies of these, and other, reports were later attached to additional pleadings and filed with the superior court.

hour. The complaint also cites to reports that suggest that these disparities in attorney compensation have led to some counties struggling to retain sufficient attorneys to represent indigent defendants—resulting in those counties having less resources and having attorneys with higher caseloads.

According to the complaint, these disparities are not new. Discussed in the complaint, a 2003 report—describing the quality of youth representation as "inconsistent and unpredictable" and leading to many children failing to receive "effective legal representation"—found that although generally youth defendants had representation at most criminal hearings, "some counties do not ever provide counsel at probable cause hearings, and, in some counties, young people go forward in a variety of hearings without the assistance of counsel." CP at 23-24, 508, 510.[4]

The complaint requests a declaration that Washington's indigent defense system is unconstitutional, as well as a permanent injunction "requiring the State to provide stable, dependable, and regular state funding sufficient to enable counties across Washington to provide constitutionally adequate . . . indigent defense services in addition to other critical services they must provide for their residents." CP at 37.

The State moved to dismiss the Counties' complaint under CR 12(b)(6). The State argued that the Counties lacked standing "to assert constitutional claims premised on the right to counsel, equal protection, or due process" because those rights "belong[ed]" to indigent criminal defendants. CP at 42. This lack of standing, the State argued, could not be cured simply by alleging that the matter was of "public importance." CP at 42 (internal quotation marks omitted). The State also argued that separation of powers principles prevented the superior court from

---

[4] CALVIN, *supra*, at 510.

8

granting the Counties a permanent injunction, which the State characterized as a "funding request." CP at 43.

Following a hearing, the superior court dismissed the Counties' complaint with prejudice on the basis of standing. Because the dismissal was based solely on standing, the superior court did not reach the issue of whether a permanent injunction would be an appropriate remedy.

The Counties appeal.

## ANALYSIS

## I. LEGAL PRINCIPLES

### A. 12(b)(6) MOTION TO DISMISS

We review an order granting a motion to dismiss under 12(b)(6) de novo. *Tavaglione v. Dehkhoda & Qadri, P.C.*, ___Wn. App. 2d___, 568 P.3d 1158, 1160 (2025). When evaluating whether dismissal was appropriate, we presume all the allegations in the complaint to be true. *Id.* at 1161. " '[A]ny hypothetical situation conceivably raised by the complaint . . . is legally sufficient to support the plaintiff's claim.' " *Id.* (second alteration in original) (internal quotation marks omitted) (quoting *Jackson v. Quality Loan Serv. Corp. of Wash.*, 186 Wn. App. 838, 843, 347 P.3d 487 (2015)).

### B. STANDING

" 'Standing is a party's right to make a legal claim or seek judicial enforcement of a duty or right.' " *Kanam v. Kmet*, 21 Wn. App. 2d 902, 908, 508 P.3d 1071 (2022) (internal quotation marks omitted) (quoting *State v. Link*, 136 Wn. App. 685, 692, 150 P.3d 610 (2007)). To establish standing to challenge the constitutionality of a statute, a party must show (1) that, by bringing suit, they are seeking to protect an interest that " 'is arguably within the zone of interests to be protected

or regulated by the statute or constitutional guarantee in question,' " and (2) that they have suffered "injury in fact." *To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 414, 27 P.3d 1149 (2001) (internal quotation marks omitted) (quoting *Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 493-94, 585 P.2d 71 (1978)). Standing is a legal question that we review de novo. *Kanam*, 21 Wn. App. at 909.

The "zone of interest" requirement, as a component of standing, helps to ensure that parties bringing legal action do not assert rights that do not belong to them. *See Wash. State Hous. Fin. Comm'n v. Nat'l Homebuyers Fund, Inc.*, 193 Wn.2d 704, 715, 445 P.3d 533 (2019) (the "zone of interest" requirement generally limits standing to only parties who were intended to be affected by the statute being challenged); *Walker v. Munro*, 124 Wn.2d 402, 419, 879 P.2d 920 (1994). In order to determine whether a party falls within the zone of interest regulated or protected by the statute or constitutional guarantee in question, we look at the statute or constitutional guarantee's purpose. *Nat'l Homebuyers Fund*, 193 Wn.2d at 715; *To-Ro Trade Shows*, 144 Wn.2d at 414-15.

Because constitutional rights are directed at the protection of individual interests, municipal corporations are not typically within the zone of interest of individual constitutional guarantees. *See, e.g.*, *Lakehaven Water & Sewer Dist. v. City of Fed. Way*, 195 Wn.2d 742, 773, 466 P.3d 213 (2020) (sewer and water district lacked standing to challenge city's excise tax for violating due process); *Locke v. City of Seattle*, 162 Wn.2d 474, 482-83, 172 P.3d 705 (2007) (city lacked standing to challenge "right to sue" provision of statute for violating the privileges and immunities clause); *Stevens County v. Stevens County Sheriff's Dep't*, 20 Wn. App. 2d 34, 37, 46,

499 P.3d 917 (2021) (county lacked standing to challenge statute for violating the Second Amendment), *review denied*, 199 Wn.2d 1008 (2022).

But this "is not an insurmountable barrier." *City of Seattle v. State*, 103 Wn.2d 663, 668, 694 P.2d 641 (1985). For example, in *City of Seattle*, our Supreme Court held that the City of Seattle (City) was within the zone of interest of the constitutional guarantee of equal protection (even though the equal protection clause typically protects individuals and not entities), when there was an intertwining of the interests of individuals' rights and the direct interests of the municipal corporation. *Id.* at 668-69 (holding that the plaintiff city had standing to challenge statute because it "ha[d] a direct interest in the fairness and constitutionality of the process by which it annexes territory" and because "it ha[d] a duty to represent the interests of [its] residents, as well as its own"). Municipal corporations can also show that they fall within the zone of interest of a constitutional guarantee if the challenged statute imposes "financial constraints" that impede the municipal corporation's ability to meet its constitutional obligations that have been delegated to it by the state of Washington. *Seattle Sch. Dist.*, 90 Wn.2d at 493-94.

The "injury in fact" requirement "precludes those whose injury is speculative or abstract, rather than actual, from bringing an action." *Nat'l Homebuyers Fund*, 193 Wn.2d at 716. An injury in fact may include economic or noneconomic injury. *Id.*

Additionally, we afford standing more liberally when the relevant controversy is of substantial public importance. *Id.* at 718 ("[T]his court has taken a 'less rigid and more liberal' approach to standing when necessary to ensure that an issue of substantial public importance does not escape review.") (internal quotation marks omitted) (quoting *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 803, 83 P.3d 419 (2004)). When determining whether

this liberal approach should be applied, courts will look at whether the resolution of the case will have a direct effect on both the people and the economy of the state. *Id.* at 718-19.

Typically, this "liberal approach" has been applied "only in cases where the plaintiff whose standing was challenged was the only plaintiff in the case and the liberal approach was necessary to ensure that the important public issues raised did not escape review." *Grant County*, 150 Wn.2d at 803 (emphasis omitted); *see*, *e.g.*, *Vovos v. Grant*, 87 Wn.2d 697, 701, 555 P.2d 1343 (1976) (applying more liberal view of standing in order to allow public defender to raise issues of youth because the youth would have had "difficulty . . . vindicat[ing] their rights on their own"). If another party could "more effectively" raise the arguments alleged in the complaint, this liberal approach will generally not be applied. *Grant County*, 150 Wn.2d at 803.

## II.  THE PARTIES DISPUTE THE COUNTIES' STANDING

In this appeal, the Counties argue that their standing to bring their complaint is clear. Relying heavily on our Supreme Court's decisions in *City of Seattle* and *Seattle School District*, the Counties contend that because they are charged with fulfilling the State's constitutional duty to provide indigent defense, they are well within the zone of interest to challenge the State's financing system for that duty. According to the Counties, the financing system directly harms their ability to obtain the revenue necessary to provide constitutionally sufficient indigent defense services while, at the same time, funding other critical services for their residents. This impact, they assert, is also sufficient to establish an injury in fact. Moreover, even if the question of their standing was a "close call," the Counties argue that the liberal approach to standing should be applied because the issue is of "serious public importance." Opening Br. at 61.

The State disagrees, contending that at its core, the Counties' complaint alleges the aggregated claims of individual criminal defendants. The State argues that the right to counsel is "personally held" by these criminal defendants and that state and federal precedent have warned in other contexts that such rights cannot be asserted "vicariously" or through third parties. Wash. Ct. of Appeals oral arg., *Wash. State Ass'n of Counties v. State*, No. 60179-6 (Jun. 16, 2025), at 14 min., 51 sec. through 15 min., 8 sec., 16 min., 28 sec. through 16 min., 41 sec., *video recording by* TVW, Washington State's Public Affair's Network, https://tvw.org/video/division-2-court-of-appeals-2025061180/?eventID=2025061180. According to the State, because these rights belong solely to the defendants, the Counties cannot be within the zone of interest.[5]

The State also alleges that the Counties lack standing because they cannot show sufficient factual injury. The State points out that the Counties do not actually allege that they are failing to fulfill their constitutional duty, they merely argue that they have to reallocate their finances from other projects. This, the State contends, is a far cry from a harm of constitutional magnitude—it is merely a "budgetary case." Resp't's Br. at 62.

Finally, the State argues that the Counties also should not benefit from a liberalized approach to standing for issues of significant public importance. The State contends that the Counties' interest in bringing this suit is self-serving and that the Counties seek to bring this claim only as a way to obtain more revenue from the State. The State essentially argues that if the Counties are allowed to bring this challenge, the criminal justice system as a whole will get worse

---

[5] Like the Counties, the State also heavily relies on *City of Seattle* and *Seattle School District*; except that the State argues these cases actually support its position, not the Counties'. We address the applicability of *City of Seattle* and *Seattle School District* below.

for criminal defendants, not better. The State explains that a funding scheme in which the Counties are forced to pay for indigent defense is critical to the balance of the criminal justice system. If the Counties are no longer paying for criminal defense, the State speculates that the Counties would choose to increase their funding for law enforcement and prosecutions without worrying about cost consequences on criminal defense funding—leading to more law enforcement. Because this would harm criminal defendants in the long run, the State suggests that criminal defendants must bring these claims themselves, making the liberal approach to standing for issues of public importance inapplicable.

III. ZONE OF INTEREST

We begin our discussion with the zone of interest requirement. The Counties must show that they are within the zone of interest of the rights they assert, specifically the rights to counsel and equal protection, within the context of their claim challenging the structural deficiencies in the statutory scheme for indigent defense services. We base our analysis on the applicability of the case law extensively cited by both parties—*City of Seattle* and *Seattle School District.*

A. APPLICABILITY OF *CITY OF SEATTLE*

In *City of Seattle*, the plaintiff City challenged the constitutionality of two statutes governing annexation of territory. 103 Wn.2d at 665-66. The superior court dismissed the City's complaint, in part, on the issue of standing. In reversing, our Supreme Court acknowledged that a municipal corporation has standing to challenge a statute for violating equal protection and the right to vote under some circumstances. *Id.* at 668. The court suggested that although the right to vote is an individual right, it implicates the integrity of the democratic process. *Id.* And because a local government has its own direct interest in protecting the integrity of the democratic process,

the local government would be in the zone of interest of an equal protection claim regarding the right to vote. *Id.* at 669.

Our Supreme Court explained, "Protection for the integrity of the political process, as well as individuals' rights, is within the zone of interests protected by the equal protection clause." *Id.* at 668-69. And, because the City would be "constrained by the procedures established by the State" if it chose to annex territory, it "ha[d] a direct interest in the fairness and constitutionality of the process by which it annexes territory." *Id.* at 669. In addition to its own "personal" interest, the City also had an interest in a sort of representative capacity because its interests in raising this equal protection claim were intertwined with those of its residents. *Id.* ("Once the City has initiated or approved an annexation petition, it has a duty to represent the interests of area residents, as well as its own interests in further proceedings."). Thus, the combination of the City's independent, direct interest in the statute's implications for the integrity of the democratic process, and the fact this interest was closely tethered to the constitutional rights of the City's individual residents, was sufficient for the City to be within the zone of interest to bring this claim.

The Counties contend that, like in *City of Seattle*, they "have a direct interest in the constitutional integrity of the State's statutory scheme." Reply Br. at 17. Therefore, because their complaint's allegations "show the State's scheme requires them to provide public defense services while failing to provide adequate funding . . . to do so in a constitutionally adequate manner," the Counties are within the zone of interest to challenge that scheme on equal protection grounds. Reply Br. at 17.

The State draws the opposite conclusion from *City of Seattle*. The State reasons that the plaintiff City was within the zone of interest to challenge the annexation statutes because the City,

as a municipality, had both a direct interest in statutes that affect its potential annexation of territory *and* because the City's interest was aligned with the interests of the City's residents (who had clear standing). However, here, the State contends that the rights that are implicated are strictly *personal* to individual indigent defendants. And, far from being aligned, the Counties' interests, because they actually prosecute criminal defendants, are in fact *adverse* to those of indigent defendants, making any sort of representational standing impossible.

We disagree that *City of Seattle* helps the State. The functioning of the criminal justice system (through the adequate provision of indigent defense counsel) is a direct interest for counties. *See City of Seattle*, 103 Wn.2d at 669. Indeed, although the right to counsel belongs to individual defendants, the right is integral to our legal system, which counties are required to administer. *See Kimmelman*, 477 U.S. at 374; *Singer v. United States*, 380 U.S. at 36; RCW 10.101.030. Focusing on only the Counties' coexistent responsibility to fund criminal prosecutions views the Counties' interests too narrowly. The Counties have equal duties to prosecute criminal defendants *and* to safeguard defendants' right to counsel. *See Kimmelman*, 477 U.S. at 374; *Singer v. United States*, 380 U.S. at 36; RCW 10.101.005; *Davison*, 196 Wn.2d at 295. The Counties also have a direct interest in the constitutionality and fairness of the criminal legal system, and in that way, their interests are closely aligned with those of indigent defendants—accordingly, *City of Seattle* supports the conclusion that the Counties are within the zone of interest for their claim.[6]

---

[6] At oral argument, the State suggested that the City in *City of Seattle* was granted standing only because "there was an overlap of interests between those of the property owners who had equal protection rights and that of the City" and "because the City was able to have representative standing." Wash. Ct. of Appeals oral arg., *supra,* at 13 min., 0 sec. through 13 min., 12 sec.; 13 min., 26 sec. though 13 min., 30 sec. We agree that *City of Seattle* requires a municipal corporation

Having established that *City of Seattle* supports the Counties' position, we turn to *Seattle School District*—another case each party claims is dispositive of a result in their favor.

B.  APPLICABILITY OF *SEATTLE SCHOOL DISTRICT*

In *Seattle School District*, our Supreme Court addressed whether Seattle School District No. 1 (District) had standing to bring suit against the State related to school funding.  90 Wn.2d at 490-95.  The District alleged that the State's system for funding school districts violated the State's " 'paramount duty' " under the Washington Constitution " 'to make ample provision' " for education and its duty to " 'provide for a general and uniform system of public schools.' "  *Id.* at 485-86, 493 (quoting WASH. CONST. art. 9, §§ 1, 2).

In analyzing the District's standing, our Supreme Court evaluated how Washington's school financing system "ha[d] been found insufficient to provide the basic operation and maintenance of schools."  *Id.* at 492.  Under this system, school districts were broadly required to meet statutory educational standards, but they allegedly received insufficient funding from the State to meet these standards.  *Id.* at 485.  Instead, school districts were somewhat expected to seek more adequate funding through local special excess levy elections.  *Id.*  However, these special levies were not dependable sources of funding, and when the levies failed, school districts were entirely dependent on state funding.  *Id.*  This led to schools being forced to defer maintenance,

to have their own direct interest *and* have "an overlap of interest" with the individuals who clearly have standing.  However, we disagree that this "overlap of interest" can only exist if a municipal corporation also has representative standing.  While meeting the requirements for representational standing is certainly one way to show sufficiently aligned interests, it is not required.  In fact, the State's overly narrow reading of *City of Seattle* is belied by the fact that the court discussed the City's direct interests in the "integrity of the political process" and its alignment with the interests of its voters separately from the City's potential representational standing.  *See* 103 Wn.2d at 668-69.

cutback on educational programs and teaching material, and reduce teaching staff. *Id.* at 493. In addition to having a direct negative impact on the schools' ability to educate its students, this insufficient funding also resulted in increasing lawsuits against school districts. *Id.*

Given the ways that the State's school financing system imposed "actual financial constraints" on the District that impeded its ability to comply with constitutional requirements, our Supreme Court said that it would be "difficult to imagine" a party with a greater interest in this litigation than the District. *Id.* at 492. It explained,

> The interests of the District are not theoretical; they involve actual financial constraints imposed upon the District by the challenged system itself. In short, the interests sought to be protected by the District are within the zone of interest either regulated by the challenged regulations and legislation or by Const. art. 9, §§ 1 and 2. Under these circumstances it would be unreasonable to deny standing to the District which, far from being a nominal party, stands at the very vortex of the entire financing system.

*Id.* at 493-94.

Here, the Counties argue that *Seattle School District* stands for the principle that local governments are within the zone of interest to "challeng[e] the failure of a statutory scheme to provide sufficient resources for them to carry out an 'obligatory' constitutional duty." Opening Br. at 41 (quoting *Davison*, 196 Wn.2d at 293; *State v. Kanistanaux*, 68 Wn.2d 652, 654, 414 P.2d 784 (1966)). Likening themselves (and their obligation to fund indigent criminal defense) to school districts, the Counties argue the two situations are analogous in terms of funding—just like school funding, the State's funding scheme delegates the State's constitutional duty to provide indigent defense services to the Counties, while at the same time failing to provide them with sufficient means to carry out this duty.

The State rejects this comparison, arguing that the rights at issue in *Seattle School District* and the rights at issue here are too "fundamentally different." Resp't's Br. at 37. The State makes the distinction that the right to a funded education is a "freestanding" right that "belongs to all children within our [s]tate" whereas the right to counsel is "an individual right that is triggered when the government prosecutes an indigent person." Resp't's Br. at 38. The State also reasons that in *Seattle School District*, our Supreme Court emphasized (and has repeatedly emphasized since) that the State's duty to fund education is " 'unique' " and " 'paramount' " because it is derived from the express language of Washington's Constitution. Resp't's Br. at 35, 37, 39 (quoting *Seattle Sch. Dist.*, 90 Wn.2d at 510, 513). In contrast, even though criminal defendants have a right to counsel, the state constitution does not expressly mention an affirmative duty for the State to fund indigent defense services.

In emphasizing the unique nature of the right to education, the State seems to contend that the applicability of *Seattle School District* should be limited to cases involving the right to education. Pointing to multiple other cases where municipal corporations failed to show they were within the zone of interest to make constitutional claims, the State contends that "*Seattle School District* did not confer broad, general standing for counties to sue the [S]tate over financial burdens or 'obligations' imposed by state law, even under a more 'liberalized view.' " Resp't's Br. at 42. It warns that granting standing to the Counties here would be an expansion that not only goes against "decades of precedent" but also would "explode the standing doctrine to afford political subdivisions nearly unlimited power to bring suit." Resp't's Br. at 29, 47.

The State also argues that not only are the rights involved in *Seattle School District* and this case too different, the parties in the two cases "are not similarly situated." Resp't's Br. at 36.

The State contends that the District was within the zone of interest to challenge Washington's education system because providing education is " '[t]he basic reason school districts exist.' " Resp't's Br. at 36 (quoting *Seattle Sch. Dist.*, 90 Wn.2d at 493-94). Counties, on the other hand, exist to do many things other than paying for criminal defense. Additionally, the State highlights that the District was not representing the constitutional interests of students alone, the District was joined by students and parents as co-plaintiffs. But, here, the State points out that the Counties are acting alone, asserting the rights of indigent defendants without them. Because of these differences, the State argues *Seattle School District* does not support the Counties' standing in this case. We are unpersuaded by the State's arguments.

The State is correct that there are differences between *Seattle School District* and this case. School districts are not the same as counties, and the State's duty to fund education is expressly stated in the state constitution and the duty to fund indigent defense is not. And certainly, *Seattle School District* should not be seen as broadly supporting standing for municipal corporations to make constitutional claims in all cases.

But, at the same time, the similarities are striking. Both *Seattle School District* and this case involve rights that are significant and constitutionally based, notwithstanding that only the duty to fund education is found in the text of the state constitution. *See Davison*, 196 Wn.2d at 293 ("The State plainly has a duty to provide indigent public defense services—both our state and federal constitutions guarantee the accused the right to counsel.")

In fact, the similarities of this case with *Seattle School District* make it strongly supportive of standing for the Counties here. As described in their complaint, the Counties are like the District—they "stand[] at the very vortex of the entire financing system" for indigent defense

services. *Seattle Sch. Dist.*, 90 Wn.2d at 494. And they are required to fulfill the State's constitutional duty to provide indigent defense services and to meet minimum standards. RCW 10.101.030. And yet, the Counties allege that the State neither provides the Counties sufficient funding or adequate or consistent means to provide or maintain indigent defense services that meet basic constitutional requirements.

It is this connection between the Counties' primary role (and responsibility) in providing this fundamental constitutional requirement and the inadequate statutory funding scheme that makes them and the District in *Seattle School District* "similarly situated." Despite the State's argument to the contrary, it does not matter that providing education is " '[t]he basic reason school districts exist' " while providing indigent defense services is just one of a county's many duties. Resp't's Br. at 36 (quoting *Seattle Sch. Dist.*, 90 Wn.2d at 493-94). Nor does it matter that the Counties bring this claim alone and not as co-plaintiffs with indigent defendants. These differences are immaterial to the natural extension of *Seattle School District*'s rationale to this case. There is little daylight between these allegations and those previously made by the District.[7]

---

[7] We are also unpersuaded by the State's position that because there have been other cases where municipal corporations have failed to establish standing, that we should view *Seattle School District* very narrowly. None of the other cases cited by the State support an overly narrow reading of *Seattle School District*, nor do they have clear application to this case. *See Locke*, 162 Wn.2d at 482, 483 n.2 (denying city's standing based on the privileges and immunities aspect of WASH. CONST. art. I, § 12, yet still acknowledging that with relaxed standing requirements, a municipal corporation can have standing to bring an equal protection challenge); *Lakehaven Water and Sewer Dist.*, 195 Wn.2d at 770-71 (denying sewer and water districts personal standing by distinguishing that municipal corporations do not have "personhood" like private corporations and thus cannot rely on cases by private corporations to assert standing for constitutional claims); *City of Ellensburg v. State*, 118 Wn.2d 709, 715, 826 P.2d 1081 (1992) (denying the relevance of *Seattle School District* on the narrow question of whether WASH. CONST. art. 11, § 11 (Police and Sanitary Regulations) requires municipalities to provide fire protection services); *Stevens County*, 20 Wn. App. 2d at 42-46 (denying county standing because having to enforce an allegedly unconstitutional

We also do not share the State's fears that granting the Counties standing here will open the floodgates for other municipal corporations to broadly assert the rights of individuals. Rights like the right to education and the right to counsel are relatively rare; they require the government to act. *See Gideon*, 372 U.S. at 342-44; *Seattle Sch. Dist.*, 90 Wn.2d at 485-86. Like the District, the Counties' constitutional duties here are not to merely enforce existing laws or refrain from encroaching on their citizens' rights; rather, the Counties have to create, fund, and manage a whole indigent defense system within their jurisdictions and ensure that that system is constitutionally compliant. *See Gideon*, 372 U.S. at 342-44; *Seattle Sch. Dist.*, 90 Wn.2d at 485-86; RCW 10.101.030. Thus, the Counties' interests here are neither "theoretical" nor adverse to the interests of indigent defendants—"they involve actual financial constraints imposed upon the [counties] by the challenged system itself." *Seattle Sch. Dist.*, 90 Wn.2d at 493. Because there are few other circumstances that impact a municipal corporation to the same extent, there are no floods to fear from granting standing to the Counties. We agree with the Counties that *Seattle School District* supports the conclusion that they are sufficiently within the zone of interest to have standing to bring their complaint.

Indeed, it would also be "difficult to imagine" a party better suited to challenge the alleged systemic constitutional failures of our statutory scheme for providing indigent defense. *Seattle Sch. Dist.*, 90 Wn.2d. at 492. As discussed above, counties have a legitimate interest in ensuring the integrity of the legal system. *See Singer*, 380 U.S. at 36. While counties have a duty to prosecute criminal defendants, they have an equal duty to safeguard defendants' right to a fair trial

---

statute and potentially being at risk for being sued was not enough to establish injury in fact or being in the zone of interest).

and their right to counsel. *See id*; *Davison*, 196 Wn.2d at 295; *see also State v. Case*, 49 Wn.2d 66, 71, 298 P.2d 500 (1956) (" 'The [prosecutor] is . . . representing the state, which seeks equal and impartial justice, and it is as much his duty to see that no innocent man suffers as it is to see that no guilty man escapes.' ") (quoting *People v. Fielding*, 158 N.Y. 542, 555, 53 N.E. 497 (1899) (Haight, J. dissenting)).   And, as administrators of indigent defense services, the Counties also have more insight into how the current system impacts public defender caseloads, county budgets, public defender retention, public defender training and quality, and wait times for appointment of counsel.   Thus, we hold that the Counties' interests are within the zone of interest of the constitutional guarantees on which they rely.[8]

IV.  INJURY IN FACT

Even if the Counties satisfy the zone of interest requirement, the State contends they fail to meet the second requirement of injury in fact.  The State characterizes the Counties' complaint

---

[8] The State also argues that *Davison*, precludes the Counties from bringing a claim based on individual rights.  The State ties this assertion to a narrow reading of the opinion's language:

> To the extent that the *plaintiff class* has alleged systemic and structural deficiencies in our state system delegating authority to local governments, that allegation expresses a valid ground for State liability.  But to prevail on this claim, we hold the *plaintiff class* must show that the current statutory scheme systemically fails to provide local governments, across Washington, with the authority and means necessary to furnish constitutionally adequate indigent public defense services.

*Davison*, 196 Wn.2d at 300 (emphasis added).  According to the State, because our Supreme Court chose to specify that a "plaintiff class" can bring a systemic claim challenging the indigent defense funding system, *only* a plaintiff class can bring such a claim—counties cannot.  The Counties reject this reading, arguing, "That [the Washington Supreme Court] referred to 'the plaintiff class' in describing the required showing merely reflects the identity of the plaintiffs there, and does not limit the scope of the claim or who can pursue it."  Reply Br. at 10.  Like the Counties, we are unpersuaded that this language from *Davison* is dispositive to the question of the Counties' standing in this case.

as a "budgetary case premised on hypothetical constitutional violations." Resp't's Br. at 62. The State alleges that even accepting the Counties' complaint as true, the current statutory scheme for funding indigent defense services merely requires the Counties to make "financial trade[-]offs" in order to fund public defense services. Resp't's Br. at 61. According to the State, the scheme in no way precludes the Counties from funding public defense. These "decision[s] to lessen funding for other county services in order to provide public defense" are issues of local policy, not issues of constitutional magnitude. Resp't's Br. at 61. Thus, the State argues that the Counties' claims are not based on harms related to violations of the right to counsel or equal protection; rather, they are based on the Counties' own "reluctance to impose additional economic responsibilities on their residents" and their " 'failure to allocate [their] resources equitably.' " Resp't's Br. at 61-62 (quoting *Davison*, 196 Wn.2d at 300).

The Counties respond that the State's arguments "ignore the systemic nature of [their] suit." Reply Br. at 19. Because their claims are systemic, the Counties contend that they are not required to support their claim with "actual deprivations of the right to counsel, due process, or equal protection," or to plead that "any particular county is 'currently unable to provide public defense services because of a lack of state funding or delegated taxing authority.' " Reply Br. at 19 (quoting Resp't's Br. at 59). Rather, the Counties contend that they must only allege that the current system imposes financial constraints that impede the Counties' ability to provide adequate indigent defense services.

We agree that the Counties have adequately shown injury in fact, especially when we construe the facts alleged in the complaint as true. The Counties' complaint does not allege theoretical harm from the indigent defense funding system; rather, it alleges that the system's

financial constraints have directly harmed its ability to meet its constitutional duty to provide indigent defense—a problem that, as seen in the many reports attached to the pleadings, has spanned over three decades. *See Seattle Sch. Dist.*, 90 Wn.2d at 494 (explaining that school district's showing that financial constraints from statutory scheme inhibited its ability to provide constitutionally adequate education was sufficient to show injury in fact). In addition to broad systemic failures, the complaint also alleges disparities among the counties, with some struggling more than others to fund indigent defense services—leading to a patchwork of defense services with indigent defendants, otherwise similarly situated, being subjected to the consequences of far fewer resources, based solely on their own financial circumstances and the jurisdiction where they are charged. These failures not only harm the Counties' ability to meet their constitutional duty, they also harm their legitimate governmental interests, within the protections of the equal protection clause, to protect the legitimacy of the criminal legal system. *See City of Seattle* 103 Wn.2d at 668-69 (holding that city had a direct interest of the "fairness and constitutionality" of its processes within the protections of the equal protection clause); *Singer*, 380 U.S. at 36; *Kimmelman*, 477 U.S. at 374. Presuming these allegations as true, the Counties have thus alleged sufficient factual injury.

## V. ISSUE OF SUBSTANTIAL PUBLIC IMPORTANCE

Our conclusion is further supported by applying standing requirements with the more liberal approach used when a claim involves an issue of public importance. *See Nat'l Homebuyers Fund*, 193 Wn.2d at 719-20. The public importance of adequate funding for indigent criminal

defense is self-evident, notwithstanding the State's arguments to the contrary.[9] As highlighted by the complaint, the legislature and the public have been made aware for over 30 years that the current indigent defense system does not "meet minimum constitutional requirements." CP at 20, 212, 269; *see also Davison*, 196 Wn.2d at 304-05 (González, J., concurring) ("The State has known for a long time" that the current statutory public defense scheme "has often led to the systematic deprivation of effective assistance of counsel."). The funding disparities among the counties, as pled in the complaint, exacerbates the hardships experienced by indigent defendants and the decline of our criminal justice system. And with the recent modifications of maximum caseload standards for indigent defense counsel, demands on these limited resources will be increasing. As the landscape is presented in the Counties' complaint, any improvement is unlikely without some sort of change. These issues, thus far, have escaped review—even if other plaintiffs *could* effectively bring a similar systemic challenge to the State's funding scheme for indigent defense, none has.

Our Supreme Court has suggested that in order to "ensure that an issue of substantial public importance does not escape review," viewing standing through the liberal lens of the public interest approach is appropriate when needed to resolve a "close call," or when it is "unclear whether a

---

[9] One of the State's arguments that this lawsuit does not represent an issue of public importance is that if funding for criminal defense is shifted away from the counties, the counties would, as a result, increase their funding of prosecutions. This argument appears to suggest that counties currently fund their prosecutorial functions at a lower level because they are also responsible for funding criminal defense. Thus, removing the counties' obligation to fund defense would actually harm defendants in the long run. Not only does this argument have little to do with whether adequate funding for indigent criminal defense is an issue of public importance, we do not share the State's cynicism in how our State's counties approach their responsibilities to administer criminal justice in their jurisdictions.

party had satisfied [the] standard two part test." *Nat'l Homebuyers Fund*, 193 Wn.2d at 718-19. We have concluded that the Counties have satisfied the standard test for standing. But even if one of the two requirements could be considered a close call, we would still find standing because of the public importance of these issues.

CONCLUSION

We offer no opinion about the wisdom of the current scheme for funding indigent defense in this state. Nor do we predict the ultimate outcome of the Counties' lawsuit. But based on the standards applied to CR 12(b)(6) motions, the Counties have alleged sufficient facts to demonstrate both that they are within the zone of interest and that they have shown injury in fact sufficient to have standing to bring this case.

We reverse the superior court and remand for further proceedings.

PRICE, J.

We concur:

MAXA, P.J.

GLASGOW, J.